2014 UT App 29

**STATE of Utah, Plaintiff and Appellee,**

v.

**Brian Allen FOUSE, Defendant and Appellant.**

No. 20120003–CA.

Court of Appeals of Utah.

Jan. 30, 2014.

Lori J. Seppi, for Appellant.

Sean D. Reyes and Karen A. Klucznik, Salt Lake City, for Appellee.

Judge GREGORY K. ORME authored the lead opinion, in which Senior Judge PAMELA T. GREENWOOD concurred.[1] Judge MICHELE M. CHRISTIANSEN authored an opinion concurring in part and concurring in the result in part.

Opinion

ORME, Judge:

¶ 1 Defendant Brian Fouse appeals his convictions on one count of stalking, a third degree felony, see Utah Code Ann. § 76–5–106.5 (LexisNexis 2012); three counts of felony violation of a protective order, see id. §§ 76–5–108, 77–36–1.1; and three counts of class A misdemeanor violation of a protective order, see id. § 76–5–108.[2] We affirm.

## BACKGROUND

### I. Stalking and Protective Order

¶ 2 Defendant and Victim were married for six years before separating in 2011. Following an incident of domestic violence, Victim obtained a temporary protective order directed at Defendant. The address listed on that order was that of a friend (Friend) with whom Victim, Defendant, and their three children had been living. Shortly after their separation, Defendant called Victim's workplace and left the following message: "Can you please tell my wife that I need her to come identify a dead body." There was no dead body, but Victim was "really scared" and called the police, and Defendant was arrested. He pled guilty to violating a protective order.

¶ 3 A few days after Defendant's arrest, Victim obtained a permanent protective order. The order required Defendant to not "contact, phone, mail, email, or communicate in any way with [Victim] either directly or indirectly" and to "stay away" from the address listed. The address listed on this order was the apartment of one of Victim's sisters, where Victim and the children were staying. The apartment was one unit of a four-plex, and another of Victim's sisters lived next door. Each of the apartments had its own unique street address, as opposed to the entire four-plex sharing an address and each of the apartments being distinguished by an apartment or unit number. The order did not list either of Victim's sisters as protected persons.

¶ 4 About a week after the permanent order was entered, Defendant mailed an envelope to the address listed on the protective order with the designation "Apt. # 1 or 2." The envelope was addressed to both of Victim's sisters, but the first letter inside was written to the sister who lived next door. It expressed Defendant's love for Victim, mentioned his desire that Victim drop the protective order, and asked the sister to please send him photos of his family. He closed the letter by writing, "Please just hold onto this other stuff. I don't have anyone else, but it'll mean a lot to me. Thanks." The envelope also contained two letters written to Victim, in which Defendant apologized for his past behavior and asked for forgiveness. The final letter contained the following statement: "Please hold onto this. It's something that the mental health doctor told me I should do even though I can't send nor talk to my wife or kids but writing sure does help."

¶ 5 Another envelope was sent the next day. It was also directed to the address listed on the protective order but with the notation "Apt. # 1 or 2 maybe 3" and with the name of the sister who lived next door to Victim. The letter informed the sister that "things are starting to look a lot better" because Friend, who was an alleged victim in a prior altercation with Defendant,

1. The Honorable Pamela T. Greenwood, Senior Judge, sat by special assignment as authorized by law. See generally Utah Code Jud. Admin. R. 11–201(6).

2. Because the provisions in effect at the relevant times do not differ materially from the statutory provisions currently in effect, we cite the current version of the Utah Code as a convenience to the reader.

had recanted his statement to the police. Defendant also stated that he was considering suing Victim for lying in connection with obtaining the protective order and that consequently Victim might be facing "serious charges" of her own, but that Victim had the power to stop all that by dropping the protective order.

¶ 6 Less than a week later, Defendant mailed a letter to the same sister with a similar apartment designation. In the letter, he thanked the sister for her friendship, said he wanted to save his marriage, and told the sister about the harm that divorce would cause Victim. The letter also contained a line that said, "Well our storage if it doesn't get paid on by Wednesday will be going up for auction.... It'd be great if your sister paid on it so that we don't lose it." The letter then asked the sister, "Please hold this poem it expresses my feelings towards [Victim], but I don't want to lose it in here."[3] The back of the included poem addressed Victim directly and asked her to "make things right for us and our beautiful boys."

¶ 7 The next month Victim found a box on her back doorstep. The box contained Victim's wedding dress, bridesmaids' dresses, a picture of Defendant and Victim dancing at their wedding, various letters, and a bride and groom figurine from the top of their wedding cake. The groom's head was broken off. Most of the letters were addressed to no one in particular, but one was addressed to God and "my wife my # 1 Love & boys." Another was addressed only to the three children, who were also listed on the protective order as persons whom Defendant could not contact. Defendant apologized to Victim in these letters and asked for her forgiveness. The box also purportedly contained "everything [Defendant] own[ed]" and a letter addressed, in Defendant's words, to "All of you who honestly think your truely better than me and who wants to take my place in my family's life." The letter chastised family members for meddling in Defendant's marriage.

¶ 8 Sometime between receiving the letters and receiving the box, Victim also received two voicemail messages. The first one was muffled, but Victim described the voice as "kind of like that scary, scary voice sound on that scary movie." Victim identified the voice on the second message as Defendant's. The message stated that he loved and missed her. A police officer listened to the messages before they were accidentally erased, but there was no documentation of the telephone numbers from which the messages originated.

¶ 9 During this same period, Defendant also mailed court documents to the address listed on the protective order. One envelope was addressed to both of Victim's sisters but listed no apartment number and contained, among other things, Defendant's request to dismiss the protective order, his answer and counterclaim to the divorce proceedings, a form related to a parent-time dispute, and a document containing Friend's recantation. Another envelope was addressed to Friend but listed no mailing address. The return address listed Victim's name and address, which is how she found it in her mailbox— marked by the Postal Service as "Return to Sender." Victim testified that the envelope was addressed in Defendant's handwriting and contained duplicates of some of the previously mailed documents as well as information about the couple's storage unit and Victim's retirement plan.

¶ 10 When each of these communications arrived at the four-plex, the sisters gave them to Victim. Victim testified that Defendant "was very controlling and made [her] feel like [she] was the one that did things wrong." She said that she chose to report the letters, voicemails, and box because she had tried to leave Defendant before, but, she testified, "He was very controlling, very verbally abusive and I finally was able to get away and get the protective order. And by me reporting it, I just felt was the right thing to do."

¶ 11 Defendant was charged with six counts of violation of a protective order, a third degree felony when committed within five years of another domestic violence offense. *See* Utah Code Ann. § 77–36–1.1 (LexisNexis 2012). Three of the charges

---

3. At the time this letter was written, Defendant was in jail.

were later reduced to class A misdemeanors. Defendant was additionally charged with one count of stalking, also a third degree felony.

## II. Trial Background

¶ 12 During jury selection, the trial court asked the potential jurors to alert the court if they thought they would have any trouble being fair. The judge explained to the potential jurors the reasoning behind the jury selection process and why attorneys are allowed to eliminate potential jurors. The judge explained that she herself had once been called as a potential juror. She remembered pondering whether or not she could be fair:

And I thought, okay, yeah, I have been a prosecutor for 30 years, but, frankly, I think I could be fair. I don't think the Defense thought I could be fair. But I thought, you know, when a case came in to me as a prosecutor I didn't just automatically assume people were guilty. You know, I looked at the case. I looked at it very carefully. I looked at the evidence that was brought in by the law enforcement. And if I didn't think that there was enough evidence to get a conviction I didn't file the case. But I thought, you know, I can be fair. I have been fair. I am fair when I look at a case that's brought in to be filed. So, you know, I answered that I could be fair.

The judge went on to explain that a sidebar was held at the trial in which she was called as a potential juror and she could tell that the defense attorney had requested that she be removed. The judge presiding over that trial disagreed, but ultimately she was not selected because a full jury was selected before her number was called.

¶ 13 She then explained that our justice system needed jurors who could be fair and so the selection process allowed both sides to strike people from the jury pool for "whatever reason, and it's not the color of your hair or the color of your eyes.... It is just sometimes you kind of look at it and think, well, that background, I am a little concerned with that background whether that person will listen fairly." The trial court then stated, "So that's what they are doing now," and asked if any members of the jury pool had questions before the attorneys were allowed to begin exercising their peremptory challenges.

¶ 14 During closing arguments, defense counsel argued that Defendant was innocent because there was "zero" evidence that Defendant had ever been served with the protective order. Defense counsel also argued his theory that Defendant did not attempt to contact Victim but only Victim's sister, who was not a protected person. After referring to the State's theory that Defendant tried to contact Victim through her sister, defense counsel then stated, "Do you know who else doesn't believe that theory? State of Utah.... [I]n order for their theory to work, they'd have to charge someone else." Defense counsel went on to explain that the State did not believe its own theory of Defendant's guilt because otherwise they would have charged the sister who lived next door as an accomplice to the crime for giving Victim the letters that were mailed to her. On rebuttal, the State argued, "I'll bet [Victim] didn't know her sister was a fish. The fish I'm talking about is a herring, a red herring." As the State was explaining what a red herring was, defense counsel interrupted, and an unrecorded sidebar conference was held. The State then continued, explaining that a red herring was a distraction for hunting hounds. "When [defense counsel] talks about [Victim's sister], that's a huge red herring. When he discusses oh, well, the State doesn't even believe its case, that's asinine. This case has been proven to you with two witnesses, three witnesses. They told you what happened."

¶ 15 In response to defense counsel's argument that there was "zero" evidence that Defendant had been served with a protective order, the State pointed the jury to evidence that a police officer had signed the return of service, signifying that Defendant had been served the order at the jail, as well as Defendant's own statements in his letter to Victim's sister referring to the contents of the protective order. The State went on to say,

The idea that he is not served is frankly ridiculous. He was served that protective order. He knew dang well what he was

doing. He was getting at [Victim] one way or the other. And if he thinks he is cute and he can get around it by addressing the envelopes to [Victim's sister], very frustrating. He is guilty. She is a protected person. There is proof of service.

¶ 16 During deliberations, the jury sent three questions to the trial court. The third question asked "if a protective order protects ... a person or an address or both." The trial court sent the following written answer to the jury: "A protective order protects the named person and the listed address." Defendant objected, arguing that the protective order did not prohibit Defendant from contacting other people at the address where Victim lived with her sister.

¶ 17 The jury convicted Defendant on all counts. He now appeals.

## ISSUES AND STANDARDS OF REVIEW

■ ¶ 18 Defendant first argues that the trial court improperly commented on the evidence and bolstered the State's credibility during jury selection. Because this issue was not preserved, Defendant must show plain error or ineffective assistance of counsel.[4] *See State v. Irwin*, 924 P.2d 5, 7 (Utah Ct.App.1996). To show plain error, Defendant must show that "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and the error is harmful." *State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993). Claims of ineffective assistance of counsel raised for the first time on appeal are reviewed as matters of law. *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162.

■ ¶ 19 Defendant next argues that the State engaged in prosecutorial misconduct. "In determining whether a given statement constitutes prosecutorial misconduct, the statement must be viewed in light of the totality of the evidence presented at trial." *State v. Cummins*, 839 P.2d 848, 852 (Utah Ct.App.1992). We review a trial court's ruling on "whether the prosecutor's conduct merits a mistrial" for abuse of discretion. *Id.*

■ ¶ 20 Defendant also argues that the trial court's answer to the jury's question regarding the scope of the protective order was an erroneous statement of law. "Claims of erroneous jury instructions present questions of law that we review for correctness." *State v. Jeffs*, 2010 UT 49, ¶ 16, 243 P.3d 1250.

■ ¶ 21 Defendant contends that there was insufficient evidence to support three of his convictions of violating a protective order. "[W]e review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury." *State v. Shumway*, 2002 UT 124, ¶ 15, 63 P.3d 94. "We will reverse a jury conviction for insufficient evidence only when the evidence is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted." *Id.*

■ ¶ 22 Defendant's final argument is that we should overturn his conviction because of cumulative error. We will reverse a conviction if "the cumulative effect of the several errors undermines our confidence ... that a fair trial was had." *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993) (omission in original) (citation and internal quotation marks omitted).

## ANALYSIS

### I. Trial Court's Comments During Jury Selection

¶ 23 Defendant first argues that the trial court improperly commented on the evidence

---

4. Defendant also argues that this issue can be reached through the "exceptional circumstances" exception to preservation. *See State v. Irwin*, 924 P.2d 5, 7 (Utah Ct.App.1996). However, as we noted in *Irwin*, "the 'exceptional circumstances' concept has been reined in considerably." *Id.* at 11. It is a "concept that is used sparingly, properly reserved for truly exceptional situations ... involving 'rare procedural anomalies.'" *Id.* (quoting *State v. Dunn*, 850 P.2d 1201, 1209 n. 3 (Utah 1993)). Such anomalies

have included a defendant being convicted of something that was no longer a crime, the entry of final judgment by a commissioner with no authority, and a major shift in the interpretation of settled law. *See id.* at 10–11. The events in this case do not fall into the "truly exceptional" category of "rare procedural anomalies." *See id.* at 11. We therefore consider only whether the issue can be reached under either the plain error or ineffective assistance of counsel exceptions.

and bolstered the credibility of the State's case when the judge told prospective jurors about her own experience in being called to jury service. Defendant also contends that defense counsel's failure to object constituted ineffective assistance of counsel. While the judge's personal narrative had some potentially problematic elements, we fail to see how the remarks were a comment on the evidence as no evidence had yet been presented and her comments were unrelated to any evidence later presented at trial. We do, however, need to carefully consider whether the judge's comments improperly bolstered the reputation of the State or undermined the credibility of defense counsel.

¶ 24 Utah courts "have made it quite clear in the past that a court may not comment on the weight of the evidence presented at trial or comment on the merits of the case in such a way that indicates a preference toward either party." *State v. Alonzo*, 973 P.2d 975, 980 (Utah 1998). We review such comments made by trial judges in context rather than in isolation. *Id.* Because this claim is unpreserved, we consider this argument under the doctrine of plain error. *State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346. Under that doctrine, Defendant must first show that an error was committed. *State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993).

¶ 25 Defendant argues that the trial judge's comments favored the prosecution when she stated that as a prosecutor she never filed charges unless she thought there was enough evidence. Defendant also argues that the court's comments "undermined the credibility of defense counsel by suggesting that defense attorneys are biased and result-driven advocates who are more interested in an acquittal than in the fairness or justness of the proceedings."

¶ 26 We do not read the trial court's comments, made before a jury was selected and sworn and before the trial itself began, in that way. The trial court's comments, viewed in context, are nothing more than an anecdote aimed at explaining to potential jurors that they could be stricken from the jury pool by either side for "whatever reason" even if they had indicated to the court that they thought they could be fair and unbiased. The trial judge made it clear that such a system actually promoted justice for both parties. While the trial judge stated that as a prosecutor she only brought charges if she thought there was enough evidence to support a conviction, she did not state that such evidence always leads to a conviction or that every defendant charged by the State is guilty. Soon after, and once the jury was empaneled and the trial got underway, the trial judge instructed the jury to "keep an open mind throughout the trial" and "to pay attention as the evidence is presented to you." And after closing arguments, the trial judge again instructed the jury, stating, "Neither the lawyers nor I decide the case. That is your role. Please do not be influenced by what you think our opinions might be. Make your decision based on the law ... and on the evidence presented in court."

¶ 27 It is best to avoid such personalized trips down memory lane as trial judges fill some of the downtime during jury selection. The history of the jury system, the benefits of jury service, and the importance of the jury in our justice system are safer topics. But viewing the judge's comments in context, "we are confident that the jury was neither confused nor misled" by her remarks about her own experience as a potential juror. *Cf. State v. Taylor*, 2005 UT 40, ¶¶ 20–24, 116 P.3d 360 (determining that a trial court's jury instructions did not bolster a witness's credibility when the instructions were viewed in context and that the "jury was neither confused nor misled" because the trial court correctly instructed the jury on how to assess witness credibility).

¶ 28 Because we determine that no error occurred, we do not reach the remaining prongs of plain error analysis. *See Dunn*, 850 P.2d at 1208–09. Similarly, because we conclude that there was no error to which defense counsel could object, any objection raised would have been futile. *See State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546. "Failure to raise futile objections does not constitute ineffective assistance of counsel." *Id.*

## II. Prosecutorial Misconduct

¶ 29 Defendant next argues that we should reverse his conviction due to prosecutorial misconduct. Prosecutorial misconduct warranting reversal of a criminal conviction occurs, inter alia, when "the prosecutor's statements during closing argument called the jurors' attention to matters they were not authorized to consider during deliberations" and the statements prejudiced the defendant. *State v. Todd*, 2007 UT App 349, ¶ 16, 173 P.3d 170. Here, Defendant claims the prosecutor made improper remarks when referring to statements made by the defense as "a huge red herring," claiming Defendant "knew dang well what he was doing," referring to Defendant's behavior as "cute," and calling the defense theory "ridiculous" and "asinine." Defendant claims that the "sarcastic and gratuitous nature of the comments heightened their impropriety and denied [Defendant] a fair trial."

¶ 30 We first consider the State's comments in response to defense counsel's assertion that the State did not believe its own theory, including the "red herring" and "asinine" statements. We recently considered the question of whether referring to defense counsel's argument as a "red herring" is prosecutorial misconduct. *See State v. Campos*, 2013 UT App 213, ¶¶ 54–57, 309 P.3d 1160. In *Campos*, the prosecutor "began his rebuttal by discussing at length the idiom of a red herring as 'a technique to confuse or distract.'" *Id.* ¶ 55. The prosecutor also stated, "And is there any relationship with a red herring and the defense in this case? They would have you believe an almost unbelievable story. Why? Simply to confuse and distract.... Why would they do that? Just a red herring. A ploy to confuse and distract." *Id.* (internal quotation marks omitted). We concluded that the prosecutor's comments in *Campos* "crossed the line from permissible argument of the evidence to an impermissible attack on defense counsel's character." *Id.* ¶ 57. By labeling the defense's tactic as an intentional technique or ploy rather than just a distraction, the prosecutor implied that "defense counsel *intended* to mislead the jury." *Id.* (emphasis in original). We noted that "[a]rguing that the evidence does not support the defense theory and that the theory is thus a distraction from the ultimate issue is fundamentally different from arguing that defense counsel is intentionally trying to distract and mislead the jury." *Id.* Stated another way, we determined that calling defense counsel's theory a distraction or irrelevant is permissible but accusing opposing counsel of using such a distraction as part of a purposeful scheme to mislead the jury is not. *See id.*

¶ 31 Here, defense counsel stated to the jury during closing argument that the fact that the State had not charged Victim's sister as an accomplice to Defendant's misdeeds was evidence that the State did not believe its own theory and that Defendant was innocent—in other words, because Victim's sister was the one who handed Victim the letters, she was equally guilty of violating the protective order and Defendant could not be guilty unless Victim's sister was, too. While it is conceivable that there could be accomplice liability for aiding another in violating a protective order, under the circumstances of this case the argument, frankly, is silly. Victim's sister's conduct was not restricted by the protective order against Defendant. And on rebuttal, the State responded by saying, "I'll bet [Victim] didn't know her sister was a fish. The fish I'm talking about is a herring, a red herring." The State then explained to the jury that red herrings were used to "distract" hunting hounds and then stated that defense counsel's statements about Victim's sister were a similar distraction and that the case against Defendant had been proven by multiple witnesses.

¶ 32 We conclude that the prosecutor's statements were not improper because they did not "cross[ ] the line from permissible argument to an impermissible attack on defense counsel's character" and were merely argument "that the theory is ... a distraction from the ultimate issue." *Id.* We also conclude that the statements were a comment about the evidence rather than an attack on defense counsel's personal character or an argument that defense counsel was *intentionally* attempting to mislead the jury.

¶ 33 The issue at trial was Defendant's guilt, not that of Victim's sister, and

given that defense counsel claimed that the lack of charges against Victim's sister was relevant to the case and definitively proved Defendant's innocence, it was entirely permissible for the prosecutor to criticize the argument for the nonsense that it was. It was permissible to call the "theory" a distraction and endeavor to redirect the jury to the issue of whether Defendant's guilt had been proven by the evidence presented during trial. *See Campos*, 2013 UT App 213, ¶ 57, 309 P.3d 1160. And while using terms like "asinine" and "red herring" can be "unwise and hyperbolic," *see State v. Tillman*, 750 P.2d 546, 556 (Utah 1987), "colloquial, vigorous, and colorful" comments often fall "within the wide latitude permitted counsel in presenting closing arguments to the jury," *State v. Bryant*, 965 P.2d 539, 549–50 & n. 10 (Utah Ct.App.1998) (holding statements made by prosecutor in response to defense counsel's claims that a witness had lied—"Give me a break," "You have to be kidding me," and "The lady is a 70–year–old sweetheart. I think of her as Aunt Bea like on the Andy Griffith show"—did not constitute prosecutorial misconduct). In this case, defense counsel's comment was asinine and the State's characterization of it as such during rebuttal did not rise to the level of prosecutorial misconduct.

¶ 34 The statements made by the State to rebut Defendant's claim that there was "zero" evidence to show that Defendant had been served with the protective order, including statements that the argument was "ridiculous" and that Defendant "knew dang well what he was doing," and the statement that he was being "cute" by sending letters to Victim through her sister, are on the same footing. Again, while such language may have been "unwise and hyperbolic," *Tillman*, 750 P.2d at 556, it does not rise to the level of prosecutorial misconduct, *see Bryant*, 965 P.2d at 549–50 & n. 10.[5]

### III. Answer to Jury Question

¶ 35 Defendant argues that the trial court improperly instructed the jury when responding to a question about the protective order. Utah law states that a protective order may "prohibit the respondent from harassing, telephoning, contacting, or otherwise communicating with the petitioner, directly or indirectly." Utah Code Ann. § 78B–7–106(2)(b) (LexisNexis 2012). To that end, protective orders may also "order that the respondent is excluded from the petitioner's residence and its premises, and order the respondent to stay away from the residence, school, or place of employment of the petitioner." *Id.* § 78B–7–106(2)(c). Defendant argues that based on the plain language of the statute, the court was incorrect in stating that "[a] protective order protects the named person and the listed address," thereby prohibiting Defendant from writing a letter to a non-protected person who resided at the same address.

¶ 36 Defendant argues that this error was prejudicial because it took away from the jury the question of intent. By informing the jury that any contact with the address was a violation of the order, Defendant argues that the trial court did not allow the jury to consider whether Defendant, through his communications ostensibly limited to Victim's sister, intended to contact or communicate with Victim either "directly or indirectly." The State argues, however, that the "plain language of Utah's protective order provisions reflects that their purpose is to restrain the defendant from further harming and harassing the protected person and placing her in fear" and, thus, the "stay away" provision in the protective order referring to Victim's address properly contemplates both physical and non-physical contact with the address.

¶ 37 There is some basis for the trial court's characterization, as the protective order statute mentions that such orders may

---

5. Because we conclude that no prosecutorial misconduct occurred, we have no need to determine whether the prosecutor's comments prejudiced Defendant. We therefore leave for another day, as we did in *State v. Wright*, 2013 UT App 142, 304 P.3d 887, the question of whether the burden rests on the State to show that the harm suffered by Defendant as a result of prosecutorial misconduct was "harmless beyond a reasonable doubt" or whether the burden rests on Defendant to show that he was prejudiced by the error. *See id.* ¶ 41 n. 6 (observing that the law regarding the correct standard of review for prosecutorial misconduct is currently unsettled).

provide for exclusion from identified residences, schools, and places of employment. Technically speaking, though, the trial court's characterization was an oversimplification of the law. Although the statute refers to protected places such as homes or businesses from which the subject of a protective order must stay away, the focus of the protection is still on a person, i.e., any references in the protective order to an address or physical location are meant as a means to protect the person and not as a means to protect a particular place, per se. *See id.* (stating that a court may order a respondent to "stay away from the residence, school, or place of employment of *the petitioner,* ... or any specified place frequented by *the petitioner*") (emphasis added). But even if we conclude that the trial court's answer constituted error, we determine the error was harmless.

¶ 38 We will only reverse a jury verdict due to error if there is a reasonable likelihood that it altered the result. *State v. Jeffs,* 2010 UT 49, ¶ 37, 243 P.3d 1250. This standard has not been met here. Defendant argues that a correct statement of law could reasonably have led to different results on four of the six counts of violating a protective order. We disagree. One of the counts that Defendant argues might have been altered was related to Defendant leaving a box—or causing it to be left—at the address listed in the protective order. In the box was a letter addressed, in part, to victim. Regardless of any response to the jury by the trial court, this was a clear violation of the provision in the protective order requiring Defendant to stay away from the premises or the provision precluding him from contacting Victim, even indirectly.

¶ 39 The remaining counts contested by Defendant relate to the letters mailed to Victim's sisters. Defendant argues that "[b]ut for the trial court's erroneous explanation of what constituted a violation of the protective order, the jury could have found that [Defendant] was not guilty ... because he did not contact [Victim] directly or indirectly; rather, he contacted [Victim's sister]—a person not covered by the protective order." We do not agree that the trial court's instruction adversely impacted the jury's verdict in light of the overwhelming evidence that Defendant fully intended to contact Victim through the letters to Victim's sisters. One of the mailings contained letters specifically addressed to Victim, as did the box. The others contained veiled threats against Victim as well as a plea to settle the account on their storage unit.

¶ 40 Defendant argues that although the letters may appear to be directed to Victim, his intent was to have Victim's sister hold onto the letters for him, not to have them distributed to Victim. But the jury was not required to accept Defendant's explanation, and we do not believe that the trial court's answer made it any less likely that the jury would do so. The jury could readily find that Defendant's decision to mail a letter to Friend with no address listed except for Victim's as the return address was a knowing and intentional attempt by Defendant to contact Victim. The same is true of his sending envelopes to Victim's sisters—one of whom lived at the same address as Victim, with the other living next door—and which letters contained messages specifically addressed to Victim. A jury could readily infer that communication directed to or dealing with one's ex-spouse, and sent to the ex-spouse's siblings, will routinely and predictably be conveyed by the siblings to their family member. Such an inference is particularly sound in this case, given the jury's awareness that Victim and her sisters were close—in both senses of that term. We therefore conclude that any error in the court's answer to the jury was harmless.

## IV. Insufficiency of the Evidence

¶ 41 Defendant argues that the evidence is insufficient to support three of the convictions for violation of a protective order, specifically those counts turning on envelopes mailed to Victim's sisters. Defendant argues primarily that there were innocent explanations for each of the communications sent to Victim's sisters, particularly the sister who lived next door, and that he only sent envelopes to the address listed on the protective order because he did not realize that each unit had its own address rather than the

same address and different unit numbers. Thus, Defendant argues, there was insufficient evidence to show he intended to communicate with or contact Victim when one view of the evidence showed that he simply misprinted the address of Victim's sister.

¶ 42 "[W]e review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury." *State v. Shumway*, 2002 UT 124, ¶ 15, 63 P.3d 94. "We will reverse a jury conviction for insufficient evidence only when the evidence is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted." *Id.*

¶ 43 As discussed above, *supra* ¶¶ 38–40, there is overwhelming evidence supporting the jury's verdict. Just because *one* view of the evidence—that Defendant was unsure of Victim's sister's address—supported his theory at trial does not mean that the evidence was insufficient to support other theories, including the view the jury apparently found the most compelling. Given the amount of material in each of the letters that was directed at or related to Victim, the jury had abundant evidence on which to convict Defendant, no matter which sister's name appeared on the envelope. The evidence in this case is simply not "sufficiently inconclusive or inherently improbable" as to warrant reversal. *See Shumway*, 2002 UT 124, ¶ 15, 63 P.3d 94.

### V. Cumulative Error

¶ 44 We will reverse a conviction if "the cumulative effect of the several errors undermines our confidence ... that a fair trial was had." *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993) (omission in original) (citation and internal quotation marks omitted). Having determined in one instance that even if any error occurred it was harmless and that otherwise no error occurred, we necessarily determine that the cumulative error doctrine does not apply. And, in any event, our confidence in the jury's verdict has not been undermined.

## CONCLUSION

¶ 45 The trial court's statements to prospective jurors about the judge's own jury experience did not improperly bolster the State's case. The State's comments made in rebuttal to Defendant's closing argument did not rise to the level of prosecutorial misconduct. The explanation given to the jury regarding the scope of the protective order may have been technically imprecise, but any error was harmless. And there is ample evidence to support the jury's verdict.

¶ 46 Affirmed.

CHRISTIANSEN, Judge (concurring in part and concurring in the result in part):

¶ 47 I concur in the majority opinion except as to Part I, in which I concur in the result only. The majority concludes that the trial judge's comments regarding her experience as a potential juror, when viewed in context, were "nothing more than an anecdote" explaining the jury selection process and were not improper. *Supra* ¶ 26. Unlike the majority, I believe that the trial judge's comments improperly bolstered the prosecution and disparaged the defense in this case. However, because the trial court's instructions to the jury were sufficient to cure any resulting prejudice, I concur in affirming Defendant's convictions.

¶ 48 A court may not comment on the weight of evidence, the credibility of a witness's testimony, or the merits of the case in such a way that indicates a preference toward either party. *State v. Alonzo*, 973 P.2d 975, 980 (Utah 1998); *State v. Adams*, 583 P.2d 89, 91 (Utah 1978). It is true that the trial judge's comments here did not necessarily indicate that the judge had any special knowledge of this case, and her comments were made before any evidence was presented. However, the judge explained to the jury that when she was a prosecutor, she did not "automatically assume people were guilty" and therefore would not have filed charges in a case if she "didn't think that there was enough evidence to get a conviction." I believe these statements may well have been understood by the jury as an indication that the judge had a predeter-

mined belief of Defendant's guilt, and the statements therefore constituted an improper judicial expression of support for the State's case. Such statements place the imprimatur of the court on the government's case and, in my view, communicate to the jury that they should trust the State's position rather than their own judgment of the evidence. In addition, I am concerned that the trial judge's recollection to the jury that a defense attorney attempted to remove her from the jury panel in the case for which she was called to jury duty may have indicated some displeasure with or distrust of defense attorneys in general.

¶ 49 Defendant did not object when the comments were made and therefore did not preserve his challenge to the trial court's comments. Accordingly, to prevail on appeal, Defendant must demonstrate that the trial court committed plain error or that he received ineffective assistance of counsel. *State v. Low*, 2008 UT 58, ¶ 31, 192 P.3d 867. And under either theory, Defendant must demonstrate that he was prejudiced by the trial judge's improper remarks. *State v. Litherland*, 2000 UT 76, ¶ 31 n. 14, 12 P.3d 92. In examining the record and evaluating the trial judge's remarks in context, I would conclude that Defendant was not prejudiced by the trial judge's comments and that reversal is not warranted. After empaneling the jury, the court instructed the jury that "the fact that the defendant is charged with a crime is not evidence of guilt" and that it must render a verdict based only on its consideration of the evidence. The court appropriately explained what the jury should consider as evidence, and explained that it should not consider the remarks of counsel or any perceived opinions of the court as evidence. At the close of trial, the trial court instructed the jury to carefully consider "all of the evidence in this case" to determine if the State had proven Defendant's guilt beyond a reasonable doubt for each count. Finally, the jury was instructed to reach a verdict based upon its "common memory," "common understanding," and "common sense" and that the jurors' verdicts "must be [their] own." There is nothing in the record to indicate that the jury did not follow these instructions in assessing the charges against

Defendant. *See State v. Harmon*, 956 P.2d 262, 271–73 (Utah 1998); *State v. Nelson*, 2011 UT App 107, ¶ 4, 253 P.3d 1094.

¶ 50 Under these circumstances, I conclude that any error committed by the trial court was harmless because any prejudice that may have inured to Defendant as a result of the judge's comments was alleviated by the trial court's instructions to the jury. Accordingly, I concur in the result on this point.

¶ 51 Because I join the majority in concluding that any error in the trial court's response to the jury's question was harmless, *supra* ¶ 40, I must also consider whether the cumulative effect of these errors deprived Defendant of a fair trial. *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993). However, even considering the cumulative effect of these errors, my confidence in the jury's verdict is not undermined. I therefore join the majority in affirming Defendant's convictions.