2020 UT App 66

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ELIESA VEA MATTHEW LYDEN,
Appellant.

Opinion
No. 20180426-CA
Filed April 23, 2020

Third District Court, Salt Lake Department
The Honorable Mark S. Kouris
No. 171908256

Herschel Bullen, Attorney for Appellant

Sean D. Reyes and John J. Nielsen, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and KATE APPLEBY
concurred.

MORTENSEN, Judge:

¶1      One evening around midnight, loud noises woke Victim. The noises seemed to emanate from the main floor of his home, so he went to investigate. As he entered his garage, Victim was quickly set upon by two individuals, one with a baseball bat, the other with brass knuckles. The evidence at trial indicated that Eliesa Vea Matthew Lyden was the assailant wielding the brass knuckles and that the attack was vengefully intended for Victim's son (Son) due to Son's involvement in a previous drug robbery. The jury convicted Lyden of aggravated burglary and aggravated assault. Lyden appeals, claiming that the evidence was insufficient to prove his identity and that serious bodily injury befell Victim. He also claims that the prosecutor engaged

in misconduct. We reject these arguments and affirm Lyden's convictions.

BACKGROUND[1]

¶2 A few days before Victim was attacked, Son and a friend robbed a drug dealer, Andrew Renteria, at gunpoint. Renteria and a friend, Tupou Finau, were upset about the robbery and wanted revenge, so Finau called her cousin Lyden for help. Lyden in turn recruited Sau Vi. The group met to plan. Through the grapevine, they discovered the address of Victim and Son's house and that Son's bedroom was in the basement.

¶3 Lyden, Vi, and Renteria set off to exact revenge. They arrived at the house around midnight and kicked in the door, which woke up Victim. Victim got out of bed and went downstairs to see what was going on. He thought it might just be Son, so he wasn't very worried. But when Victim made it to the living room, he saw Lyden and Vi heading to the basement, heard someone say, "oh, shit," and then saw the two head to the garage. Renteria was already in the basement and later escaped through a basement window. He was not involved in the attack on Victim.

¶4 Thinking that Lyden and Vi were Son's friends, Victim went to talk them. But when Victim entered the garage, Vi swung a wooden baseball bat at Victim's head. Lyden then joined in, repeatedly punching Victim with brass knuckles.

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Tulley*, 2018 UT 35, ¶ 4 n.1, 428 P.3d 1005 (cleaned up).

Victim fell to the ground and tried to protect his head from an onslaught of blows from the baseball bat and brass knuckles. After landing numerous hits and breaking the baseball bat over Victim's head, the two fled.

*The Investigation and Trial*

¶5 Victim sustained numerous injuries from the incident. At the hospital, police officers photographed a gash over his eye; another gash on the top, right side of his head; a severely swollen left arm; and large welts on both arms. For months after the attack, Victim suffered from cognitive problems, lightheadedness, dizziness, and impaired hearing and vision. Almost one year later, he still experienced headaches, short-term memory loss, and tendon damage that prevented him from lifting certain weights, popping wrists, and numbness and aching in his fingers.

¶6 Throughout the State's investigation and prosecution of Lyden, various witnesses identified Lyden as one of the assailants. In a pre-trial photo lineup, Victim identified Lyden as someone who "resemble[d] the offender in [the] case but [he was] not positive." At trial, Finau, Renteria, and Lyden's sister all testified about Lyden's involvement. Finau testified that Lyden left with Renteria and Vi to go to Victim's house that night. She also testified that Lyden admitted his involvement in the night's events to her and that he related details of the events: he, Renteria, and Vi went in the house; they were going downstairs; Victim came downstairs, which caused Lyden and Vi to scamper to the garage; and they beat Victim with brass knuckles and a baseball bat. She also testified that, when she went to Lyden's house, Lyden admitted to throwing away his clothing because "[i]t was evidence" and "had blood on it."

¶7 Renteria's testimony as to the events of that night was consistent with the other testimonies and the police investigation. He said that the three of them went to Victim's

house and forced the door open. He confirmed that Lyden had brass knuckles. Renteria finally testified that he jumped out of the basement window and ran when he heard someone yell, "oh, shit," upstairs.

¶8     Lyden's sister testified that, after the attack, Lyden sent her Facebook messages with videos of himself washing blood off of clothing, as well as a link to a news article about the attack. She identified the hand in the videos as Lyden's from his heart-shaped hand tattoo. She also testified that Lyden called her and told her that everything went wrong and that he hit someone.

¶9     The State also introduced evidence related to home security footage from a neighbor's camera. The video showed Vi's car pull up and stop at Victim's house, two or three people exit the car and walk toward Victim's house, and one to two people return to the car. Another neighbor testified that he saw three people standing by Victim's house, heard some loud noises, and then saw two people running away from the house that evening.

¶10     After the State's case-in-chief, Lyden moved for a directed verdict, asserting that there was insufficient evidence of his identity and serious bodily injury to Victim. The district court denied the motion. During the State's rebuttal closing argument, the prosecutor said, "Attorneys have only so much we can do, based off of the evidence that we have . . . . So, this is no reflection on these two good attorneys, but their argument and their theory is not good." Lyden objected, saying, "I think this is getting to the level of prosecutorial misconduct with respect to commenting on the defense theory." The court overruled the objection. The prosecutor resumed, later stating, "These are two good attorneys. But what their client has given them is not good evidence." No objection was lodged at this point. The prosecutor later on said, "Again, this is no reflection upon the good attorneys that have been here today, but we all have the

evidence that we have or the lack thereof. . . . Follow the evidence." Again, no objection was made. The jury found Lyden guilty of aggravated burglary and aggravated assault. Lyden appeals.

ISSUES AND STANDARDS OF REVIEW

¶11    Lyden raises two issues on appeal. First, he contends that the evidence was insufficient as to his identity on both convictions and as to serious bodily injury on the aggravated assault conviction. "We will not reverse a jury verdict if we conclude that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. Maestas*, 2012 UT 46, ¶ 177, 299 P.3d 892 (cleaned up). Thus, "we may reverse a verdict only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he or she was convicted." *State v. Graves*, 2019 UT App 72, ¶ 17, 442 P.3d 1228 (cleaned up).

¶12    Second, Lyden contends that the State engaged in prosecutorial misconduct by making the three statements related to the defense attorneys and their theory. Prosecutorial misconduct is not "a standalone basis for independent judicial review," *State v. Hummel*, 2017 UT 19, ¶ 111, 393 P.3d 314, meaning that we do not review the prosecutor's actions; rather, when a prosecutorial misconduct objection is made below, we review the district court's ruling on the objection for abuse of discretion, *State v. Reid*, 2018 UT App 146, ¶ 40, 427 P.3d 1261; *State v. Fouse*, 2014 UT App 29, ¶ 19, 319 P.3d 778. When a prosecutorial misconduct objection is not made, however, "the law of preservation controls and we review the issues under established exceptions to the law of preservation." *Reid*, 2018 UT App 146, ¶ 40 (cleaned up).

ANALYSIS

I. Insufficient Evidence

A.     Identity

¶13     Lyden's contention that there was insufficient evidence of his identity rests on the premise that various testimonies were inherently improbable.[2] He argues that Finau's, Renteria's, and his sister's testimonies were inherently improbable, pointing out various inconsistencies among the testimonies and internal inconsistencies within each testimony. But, even in the face of these inconsistencies, this case doesn't come close to falling under the inherent improbability exception.

¶14     As a widely accepted general rule, weighing the evidence and the choice between conflicting evidence is the factfinder's exclusive role. *E.g.*, *State v. Prater*, 2017 UT 13, ¶ 32, 392 P.3d 398 (explaining that appellate courts are "not normally in the business of reassessing or reweighing evidence" and resolve "conflicts in the evidence in favor of the jury verdict" (cleaned up)); *State v. Cegers*, 2019 UT App 54, ¶ 41, 440 P.3d 924 ("The jury serves as the exclusive judge of both the credibility of witnesses and the weight to be given particular evidence." (cleaned up)). However, the inherent improbability exception—

---

2. Lyden also asserts that the jury speculated as to his identity, offering alternative theories in an attempt to explain away some of the evidence. But his arguments employ an overly broad understanding of speculation. Merely providing alternative explanations of the evidence to support a favorable conclusion does not constitute speculation; rather, speculation has no underlying evidence to support it. *See Salt Lake City v. Carrera*, 2015 UT 73, ¶ 12, 358 P.3d 1067. And there is certainly a robust evidentiary basis to identify Lyden as one of Victim's attackers. *See infra* ¶¶ 16–18.

an extremely rare exception[3]—allows a court to disregard certain testimony in considering whether there is sufficient evidence to support a conviction. *Prater*, 2017 UT 13, ¶ 34; *State v. Robbins*, 2009 UT 23, ¶ 16, 210 P.3d 288. The exception applies only when a party can prove three elements: (1) material inconsistencies in an individual's statements, (2) a complete lack of corroboration (i.e., no other circumstantial or direct evidence of the defendant's guilt), and (3) patent falsity in the witness's statements. *Prater*, 2017 UT 13, ¶ 38; *Robbins*, 2009 UT 23, ¶ 19.

¶15 Here, we easily conclude that two of the elements—a complete lack of corroboration and patent falsity—are missing, and we address both. To be abundantly clear, however, the lack of either defeats Lyden's claim. *See State v. Rivera*, 2019 UT App 188, ¶ 24, 455 P.3d 112 ("On appellate review, because all three elements of the inherent improbability exception must be met . . . , where we identify that any one of them is missing, the claim of inherent improbability fails.").

1.    Corroboration

¶16 The witnesses' testimonies that Lyden claims were inherently improbable were corroborated in numerous ways, which conclusively undermine Lyden's claims. *See id.*; *see also Prater*, 2017 UT 13, ¶ 38 (noting that a "lack of any corroboration" is required for the inherent improbability exception to apply); *Robbins*, 2009 UT 23, ¶ 19 ("The existence of any additional evidence supporting the verdict prevents the

---

3. Utah caselaw is replete with propositions related to the significant rarity of the inherent improbability exception's application. *E.g.*, *State v. Rivera*, 2019 UT App 188, ¶ 23 n.6, 455 P.3d 112 ("A case which actually falls within the *Robbins–Prater* rubric is exceedingly rare. In fact, we have not found a single Utah decision examined under that rubric that has reversed a verdict since *Robbins*.").

judge from reconsidering the witness's credibility."). To start, Lyden's own incriminating admissions and actions corroborated the testimonies. He sent his sister a video of himself washing blood off of clothing and a link to a news article about the attack. His sister knew it was Lyden's hand in the video because she recognized Lyden's heart-shaped hand tattoo. He also called his sister and told her that everything went wrong and that he hit somebody. And Finau testified that Lyden admitted his involvement to her and the details of the night's events. She also attested that she went to Lyden's house and that Lyden admitted throwing away some clothing because "[i]t was evidence" and "had blood on it."

¶17 Beyond Lyden's own corroborative guilty behavior and statements, which in themselves would be plenty to defeat his claims, other evidence is consistent with, and thus corroborates, those testimonies. Initially, it should be noted that the witnesses' testimonies corroborated each other, amounting to one logical version of events and adding another layer of corroboration. *See Prater*, 2017 UT 13, ¶¶ 13, 43 (noting the consistent testimony among the three witnesses); *Rivera*, 2019 UT App 188, ¶ 26 (explaining that the victims "uniformly reported the abuse" and that "the details in the [victims'] statements about the abuse" were consistent). And while not directly establishing identity, the neighbor's testimony about seeing people stand by Victim's house, hearing loud noises, and then seeing two people running from Victim's house that night and the evidence related to the video footage corroborated the narrative the witnesses related. Similarly, although Victim did not identify Lyden as one of the assailants during trial, Victim's pre-trial identification that Lyden resembled one of the assailants corroborated the testimonies, regardless of its relatively low probative value.

¶18 In sum, the witnesses' trial testimonies were significantly corroborated. Therefore, they do not come close to being characterized as inherently improbable, and Lyden's associated claim that there was insufficient evidence as to his identity fails.

2.      Patent Falsity

¶19    Lyden's inherent improbability claims also fail because there is no indication of patent falsity in the witnesses' testimonies. *See Rivera*, 2019 UT App 188, ¶ 24. To be inherently improbable, the testimony must not simply be false, but patently false. *See, e.g.*, *Prater*, 2017 UT 13, ¶ 38 (noting that the testimony must be patently false for the inherent improbability exception to apply); *Robbins*, 2009 UT 23, ¶¶ 17–18 (holding that the testimony must be "physically impossible" or "include circumstances where a witness's testimony is incredibly dubious and, as such, apparently false"); *Cegers*, 2019 UT App 54, ¶¶ 42, 47 (explaining that for testimony to be inherently improbable it must describe "an action that was physically impossible or is manifestly false without any resort to inferences or deductions" and holding that the victims' testimonies were not inherently improbable, in part, because they were not patently false (cleaned up)). Patently means "clearly, obviously, plainly." *Patently*, Webster's Third New Int'l Dictionary (1971). Therefore, testimony will check the patent falsity box of the inherent improbability exception only when it is physically impossible or self-evidently false. *See, e.g.*, *Robbins*, 2009 UT 23, ¶ 17.

¶20    Nevertheless, Lyden advances several arguments that the testimonies were patently false.[4] He argues that his sister's testimony and Renteria's testimony are both patently false because they had motives to lie: his sister to protect her boyfriend from being implicated and Renteria for leniency from the State related to his own criminal charges. But this argument ignores the very definition of patent falsity. A motive to lie does not amount to patent falsity because such a motive would require an inference or deduction that the witness is in fact acting on that motive, and such a necessity in turn would mean

---

4. Other than a few conclusory statements, Lyden does not point out why Finau's testimony is patently false.

that the testimony is not self-evidently false. *See id.* ("Testimony is apparently false if its falsity is apparent, without any resort to inferences or deductions." (cleaned up)); *accord Prater*, 2017 UT 13, ¶ 32. Moreover, our supreme court rejected this same argument in *Prater*. 2017 UT 13, ¶ 41 (explaining that testifying "in light of favorable treatment offered by the State goes to the weight and credibility of the testimony" and that such determinations are exclusively for the factfinder). And we likewise rejected this argument in *Cegers*. 2019 UT App 54, ¶ 46. In doing so, we reiterated that "a motive to lie does not automatically render a witness's testimony apparently false"; rather, "it goes to the weight and credibility of the testimony" and provides an opportunity to attack a witness's credibility on that basis during trial. *Id.* (cleaned up). Hence, the witnesses' potential motives to lie were for the jury to consider, not this court.

¶21 Next, Lyden asserts that his sister's testimony was patently false because she testified that "Lyden took the [baseball] bat used in the assault from their parents' garage," and that it was "a silver, metal baseball bat, but the [baseball] bat used in the assault was a black, wooden [baseball] bat." But that is not what the transcript of the sister's testimony reflects. It is true that she testified that Lyden took a metal baseball bat from their parents' garage. However, she never testified as to the particular baseball bat used in the attack on Victim. After all, she couldn't have. The evidence indicates that she was not at Victim's house during the attack. Thus, this argument fails to establish patent falsehood.

¶22 In sum, Lyden has failed to convince us that the testimonies were patently false. Indeed, there is nothing self-evident from the testimonies that they were false; instead, the testimonies described a logical narrative and completely plausible event. And unlike allegations that would be physically impossible, such as that the crime "occurred on the moon," *see Robbins*, 2009 UT 23, ¶ 17, the testimonies were nowhere near

physical impossibility. The testimonies do not present an issue of patent falsity, and Lyden's claim of inherent improbability fails on this basis alone. Therefore, his claim of insufficient evidence as to his identity as the perpetrator necessarily fails as well.

B.     Serious Bodily Injury

¶23    Lyden next argues that there was insufficient evidence that Victim suffered serious bodily injury and that his conviction for second-degree aggravated assault must therefore be reversed. *See* Utah Code Ann. § 76-5-103(2)(a) (LexisNexis Supp. 2019).[5] To illustrate his point, Lyden directs us to the different statutory definitions of "bodily injury," "substantial bodily injury," and "serious bodily injury" and to various precedents. We disagree with Lyden.

¶24    The Utah Criminal Code delineates three tiers of injury in the criminal context: bodily injury being the lowest tier, substantial bodily injury the middle, and serious bodily injury the highest. *State v. Ekstrom*, 2013 UT App 271, ¶ 16, 316 P.3d 435. Bodily injury is "physical pain, illness, or any impairment of physical condition." Utah Code Ann. § 76-1-601(3). Substantial bodily injury is "bodily injury, not amounting to serious bodily injury, that creates or causes protracted physical pain, temporary disfigurement, or temporary loss or impairment of the function of any bodily member or organ." *Id.* § 76-1-601(16). And serious bodily injury is "bodily injury that creates or causes serious permanent disfigurement, protracted loss or impairment of the function of any bodily member or organ, or creates a substantial risk of death." *Id.* § 76-1-601(15).

---

5. Although some of the statutory provisions have been amended, they have not changed in any way material to our analysis. Therefore, we cite the current version of the Utah Code for the sake of convenience.

¶25 "Utah appellate courts have been asked repeatedly to clarify the injuries that fall within each [tier]." *Ekstrom*, 2013 UT App 271, ¶ 16. And in many instances evidence of the victims' injuries has been sufficient to present to the jury the issue of whether serious bodily injury occurred. *See, e.g., State v. Kirby*, 2016 UT App 193, ¶ 24, 382 P.3d 644 (deep bruising, laceration, strangulation marks, and a fractured orbital bone); *State v. Hale*, 2006 UT App 434U, para. 6 (torn rotator cuff); *State v. Bloomfield*, 2003 UT App 3, ¶ 18, 63 P.3d 110 (temporary unconsciousness); *State v. Leleae*, 1999 UT App 368, ¶ 20, 993 P.2d 232 (broken jaw); *see also State v. King*, 604 P.2d 923, 926 (Utah 1979) (temporary unconsciousness and stab wound).

¶26 In this case, Victim was hit numerous times with a baseball bat and brass knuckles all over his arms, torso, and head. From this attack, he sustained significant injuries, including several gashes in his head and wounds all over his arms. Victim also endured problems with cognition, balance, hearing, and vision for months after the attack. And he suffered from headaches, short-term memory loss, tendon damage preventing him from lifting certain weights, popping wrists, and numbness and aching in his fingers almost a year later at the time of Lyden's trial. These continuing health issues were sufficient for the jury to conclude that there was "protracted loss or impairment of the function of [Victim's] bodily member[s] or organ[s,]" namely his brain, wrists, and fingers. *See* Utah Code Ann. § 76-1-601(15); *see also Leleae*, 1999 UT App 368, ¶ 20 ("Reasonable minds could conclude a broken jaw that is wired shut for six weeks with resulting eating difficulties, weight loss, extraction and later replacement of a tooth, and continuing pain is a protracted loss or impairment of the function of a bodily member." (cleaned up)). Simply put, evidence of these injuries was enough for a reasonable jury to "find that [serious bodily injury] had been proven beyond a reasonable doubt." *See State v. Maestas*, 2012 UT 46, ¶ 177, 299 P.3d 892 (cleaned up).

II. Prosecutorial Misconduct

¶27    Lyden argues that the district court erred by overruling his objection alleging prosecutorial misconduct during the State's closing rebuttal. But Lyden objected only to the prosecutor's first comment, not to the second or third comments with which he now takes issue on appeal. In so doing, Lyden failed to preserve issues related to the latter two comments. *See State v. Hummel*, 2017 UT 19, ¶ 119, 393 P.3d 314 ("[T]here is a preservation problem. For all but one of the statements in question, [the defendant] raised no objection at trial."); *see also State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443 ("When a party fails to raise and argue an issue in the [district] court, it has failed to preserve the issue, and an appellate court will not typically reach that issue absent a valid exception to preservation."). Therefore, we review the district court's ruling on the first comment for abuse of discretion, *see State v. Reid*, 2018 UT App 146, ¶ 40, 427 P.3d 1261, and we review the second and third comments for plain error, which Lyden argues in the alternative, *see id.*

A.    First Comment

¶28    During closing rebuttal argument, the prosecutor first said, "Attorneys have only so much we can do, based off of the evidence that we have . . . . So, this is no reflection on these two good attorneys, *but their argument and their theory is not good*." (Emphasis added.) Lyden objected to this comment, arguing, "I think this is getting to the level of prosecutorial misconduct with respect to commenting on the defense theory." We conclude that the district court's decision to overrule Lyden's objection was not an abuse of discretion.

¶29    A claim of prosecutorial misconduct on appeal involves establishing two things: misconduct—that the conduct was improper—and prejudice—that the conduct was harmful such that our confidence in the verdict is undermined. *E.g.*, *State v.*

*Fouse*, 2014 UT App 29, ¶ 29, 319 P.3d 778. Broadly speaking, "to determine whether a prosecutor's remarks are so objectionable as to merit a reversal, we must determine whether the remarks call to the attention of the jurors matters which they would not be justified in considering in determining their verdict." *State v. Campos*, 2013 UT App 213, ¶ 50, 309 P.3d 1160 (cleaned up).

¶30   In the specific context of commenting on the defense's theory, "it is not improper for counsel to contest the opposing party's theories as irrelevant or improbable," so long as "it does not amount to a personal attack on defense counsel or an insinuation that the defense intends to mislead the jury." *State v. Jones*, 2015 UT 19, ¶ 55, 345 P.3d 1195; *see also Campos*, 2013 UT App 213, ¶ 57 (explaining that there is a line between "permissible argument of the evidence to an impermissible attack on defense counsel's character"). For example, in *Jones*, our supreme court held that there was no misconduct when the prosecutor attacked the defense counsel's arguments, making "multiple references to red herrings" because they "did not amount to an accusation that [the defendant] or his counsel intentionally tried to confuse the jury." 2015 UT 19, ¶ 55 (cleaned up). And, in *Fouse*, this court held that calling the defense's arguments "red herrings" and "asinine" did not amount to misconduct because "the statements were a comment about the evidence rather than an attack on defense counsel's personal character or an argument that defense counsel was *intentionally* attempting to mislead the jury." 2014 UT App 29, ¶¶ 30–32.

¶31  Conversely, in *Campos*, this court held that the prosecutor's comment rose to the level of misconduct. 2013 UT App 213, ¶ 54. There, the prosecutor said, "They would have you believe an almost unbelievable story. Why? Simply to confuse and distract." *Id.* ¶ 55. This court explained that this comment was "an impermissible attack on defense counsel's character" in that it conveyed "that defense counsel *intended* to mislead the jury." *Id.* ¶ 57. But even the *Campos* court acknowledged that attacks on the defense's theory rather than

on counsel personally are appropriate. *Id.* ¶ 56 ("Referring to defense counsel's theory as a red herring would not be inappropriate so long as the reference could be classified as a comment on the strength of the evidence and the inferences and deductions arising therefrom." (cleaned up)).

¶32 Here, like the comments in *Jones* and *Fouse* and further supported by the acknowledging dictum in *Campos*, the prosecutor's first comment did not step into the forbidden area of attacking defense counsel rather than the defense's theory. Indeed, the attack was explicitly not against the attorneys and was instead directed toward their argument and theory: "So, this is no reflection on these two good attorneys, but their argument and their theory is not good." Accordingly, the district court did not abuse its discretion in overruling Lyden's prosecutorial misconduct objection because the comment was not improper.

B.      Second and Third Comments

¶33 Although Lyden has failed to preserve issues related to the prosecutor's second and third comments, he has argued, in the alternative, that we "should reverse for plain error." We therefore review "whether counsel's missteps were so egregious that it would be plain error *for the district court* to decline to intervene *sua sponte*." *Hummel*, 2017 UT 19, ¶ 110; *see also State v. Bond*, 2015 UT 88, ¶ 44, 361 P.3d 104 (holding that even "unpreserved federal constitutional claims are not subject to a heightened review standard but are to be reviewed under our plain error doctrine"). "To demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the [district] court; and (iii) the error is harmful, i.e., absent the error there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, our confidence in the verdict is undermined." *State v. Holgate*, 2000 UT 74, ¶ 13, 10 P.3d 346 (cleaned up).

¶34 Lyden argues that the prosecutor's comments improperly shifted the burden of proof. In his second comment, the prosecutor said, "These are two good attorneys. But what their client has given them is not good evidence." Then, in his third comment, the prosecutor said, "Again, this is no reflection upon the good attorneys that have been here today, but we all have the evidence that we have or the lack thereof. . . . Follow the evidence." Regardless of whether the comments were an obvious improper shifting of the burden of proof, a proposition which we view as dubious,[6] they were certainly not prejudicial. Therefore, Lyden's plain error argument falls short.

¶35 There was overwhelming evidence of Lyden's guilt presented to the jury. *See supra* ¶¶ 5–9. That evidence included (1) Lyden's own immensely incriminating admissions and actions, (2) testimony from his accomplice Renteria regarding the details of the events that night, (3) evidence related to the neighbor's video footage corroborating the witnesses' narrative,

---

6. "Claims that the prosecutor's argument shifted the burden of proof rarely succeed." *State v. Davis*, 2013 UT App 228, ¶ 54, 311 P.3d 538 (holding that the prosecutor's comments on the lack of evidence brought forth by the defendant did not improperly shift the burden of proof), *abrogated on other grounds by State v. Ringstad*, 2018 UT App 66, 424 P.3d 1052. More to the point, "it is not improper for the prosecution to argue the case based on the total picture shown by the evidence *or the lack thereof* or to fully discuss from its perspective the evidence and all inferences and deductions it supports." *State v. Maestas*, 2012 UT 46, ¶ 167, 299 P.3d 892 (emphasis added) (cleaned up) (rejecting a claim that the prosecutor's argument that the defendant could have obtained an independent DNA test shifted the burden of proof); *see also State v. Nelson-Waggoner*, 2004 UT 29, ¶ 33, 94 P.3d 186 (explaining that a prosecutor is "free to highlight an overall shortfall of defense evidence").

(4) the other neighbor's testimony corroborating the witnesses' testimonies, (5) Victim's testimony of the attack and his injuries, (6) photographs of Victim's injuries, and (7) Victim's pre-trial identification of Lyden as resembling one of the attackers. Furthermore, the court and counsel reminded the jury at least eight times that the prosecutor bore the burden of proving Lyden's guilt.

¶36 Accordingly, we conclude that, absent the prosecutor's remarks, it is unlikely that the outcome would have been different, and therefore we see no prejudice. Any claim of plain error related to these comments fails.

CONCLUSION

¶37 We hold that the evidence was sufficient both as to Lyden's identity and as to Victim's serious bodily injury. We also hold that the State's first comment in closing argument did not rise to the level of prosecutorial misconduct. We finally hold that Lyden did not preserve issues related to the State's second and third comments in closing argument and that the district court did not commit plain error by not intervening because Lyden was not prejudiced by those comments.

¶38 Affirmed.

———————