**2016 UT App 193**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
KEVIN DARRELL KIRBY,
Appellant.

Opinion
No. 20140012-CA
Filed September 9, 2016

Third District Court, Salt Lake Department
The Honorable Katie Bernards-Goodman
No. 131905196

Joanna E. Landau, Attorney for Appellant

Sean D. Reyes and Kris C. Leonard, Attorneys
for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which JUDGE
STEPHEN L. ROTH and SENIOR JUDGE PAMELA T. GREENWOOD
concurred.[1]

ORME, Judge:

¶1     Defendant Kevin Darrell Kirby and a female acquaintance
with whom he was romantically involved (Victim) partied
together in a motel room in Salt Lake City. Before long, their
room became a crime scene, and Kirby was charged and later
convicted of tampering with a witness, a third degree felony, *see*
Utah Code Ann. § 76-8-508(1) (LexisNexis 2012); aggravated

---

1. Senior Judge Pamela T. Greenwood sat by special assignment
as authorized by law. *See generally* Utah R. Jud. Admin. 11-
201(6).

assault, a second degree felony, *see id.* § 76-5-103(2)(b) (Supp. 2016); and aggravated kidnapping, a first degree felony, *see id.* § 76-5-302(3).[2] Kirby appeals. We affirm.

BACKGROUND

¶2     This case arises out of facts that are all too familiar. *See NISVS Infographic*, Centers for Disease Control and Prevention, http://www.cdc.gov/violenceprevention/nisvs/infographic.html [https://perma.cc/VT84-HVQ7] (noting that "20 people per minute are victims of physical violence by an intimate partner in the United States"). While Victim's and Kirby's accounts differ markedly, "we view the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury," *State v. Hales*, 2007 UT 14, ¶ 36, 152 P.3d 321 (citation and internal quotation marks omitted), which in this case means we accept Victim's version of events.

¶3     On December 30, 2012, Kirby and Victim, whose relationship centered around the misuse of drugs, rented a motel room on Salt Lake City's North Temple Street. Kirby bought crack cocaine and vodka, which he and Victim both consumed. They also took several of Victim's prescription painkillers. Before Kirby awoke the next day, Victim obtained more drugs, which both she and Kirby consumed. Kirby accused Victim of sleeping with the dealer to obtain the drugs and declared that he would beat Victim if she did not tell him the truth about how she came by the drugs.

¶4     Victim repeatedly denied the accusation, and an angered Kirby lunged at Victim, who retreated into the bathroom.

---

2. The changes made to these statutes since the crimes occurred have no bearing on the issues before us. So for ease of reference, we cite the current codification of these statutes.

Although Victim shut the door behind her, Kirby kicked it down before knocking Victim to the ground and kicking her in the head and face until she was bleeding profusely. Kirby cleaned up the blood with towels and left them on the bathroom floor.

¶5 Victim then asked Kirby to allow her to get some help, but he refused, saying that if he let her go "he was going to go [back] to prison." Some time later, Victim was able to pull herself up—only for Kirby to knock her to the ground and beat her again. Victim again asked to leave, and Kirby again refused, saying "he wasn't going to go to prison for nothing." After Kirby finished beating Victim, she lay down on the bed nearest the exterior door. Noting this, Kirby threatened to continue the beating unless Victim moved away from the door. Victim complied.

¶6 The following day, Kirby left the motel room to return a recent purchase to a local retailer in order to procure money for drugs. Although he left Victim alone in the motel room, he ordered her to stay and suggested that he might be watching even when he was not obviously present. Out of fear, Victim stayed put.

¶7 Upon Kirby's return, Victim—who "could hardly move"—again requested permission to leave, promising that if allowed to do so, she would not call the police. According to Victim, "because [Kirby had] really fucked [her] up this time," Kirby was both sure Victim would call the police and that "he would go to prison" if she did. Kirby therefore told her not to leave. Nonetheless, Victim packed her suitcase as if to leave.

¶8 Kirby then grabbed the suitcase, unpacked it, and, when Victim tried to retrieve it from him, resumed beating her. Kirby beat Victim with both his fists and a knotted sock containing, at

various times, a telephone handset and a metal padlock.[3] As the beating continued, Kirby attempted to kick Victim, but his foot missed, and he dented the wall instead. He then began to stomp on Victim before grabbing her around the neck, only stopping after Victim ripped his shirt and grabbed his genitals. Victim testified that after the beating was over, as she cried in pain, Kirby told her, "Just fucking stop, because you are going to make me lose my mind. Just let me gather my fucking thoughts before you make me do something and I just fucking kill you."

¶9 The next day—the final day of Victim's ordeal—Kirby told Victim that he would rape her daughter before killing Victim, her daughter, her other children, their father, and finally himself. Victim did not regard this as an idle threat, because she was aware that Kirby knew where her children and their father lived. Later, after allowing Victim to use his phone for a couple of minutes, Kirby noticed that Victim deleted some text messages she had sent to her daughter that day. He then picked up a lamp, and Victim, fearing he intended to beat her with it, fled.

¶10 Although it was dark and Victim was severely injured, she made her way to a nearby bus stop. Kirby followed her and attempted to coerce her back into the motel room, but Victim refused to follow him. A man saw the dispute when he got off a bus. The man called 911 after witnessing Kirby's behavior toward Victim and the look of terror he perceived on her face.

¶11 When officers arrived, Victim initially denied anything was wrong. Once away from Kirby, however, she told an officer, "He did all this to me," and explained that Kirby held her

---

3. During the beating, Kirby dropped both the phone and the padlock. Victim hid them in the motel room, and police later found both items where Victim said they would be.

against her will for three days. The officers then arrested Kirby, who accused Victim of making false accusations.

¶12    When paramedics arrived to help Victim, they found that she had extensive injuries, including a fractured left orbital bone, a laceration on the back of her head accompanied by bruising and swelling, open cuts above each eye, bruising and marks on her neck consistent with strangulation, and extensive bruising over much of the rest of her body and extremities.

¶13    During a search of the motel room, officers noted that it appeared as though a fight had taken place in the room. They also found physical evidence supporting Victim's account, including bloody towels piled in the bathroom, a pillow and sheets with blood on them, a ripped sock with a knot in it, a "hole" in one wall, and the padlock and telephone handset.

¶14    At trial, Kirby took the stand in his own defense. Although he conceded having abused illegal drugs and other intoxicating substances with Victim, his account differed dramatically from hers in all other respects. Most notably, he portrayed himself as a sort of caretaker for Victim, blamed most of Victim's injuries on her drug use and her own unsafe behavior, and claimed Victim initiated the case against him in retaliation for his romantic involvement with another woman. Kirby also insisted that he would never hurt Victim. In rebuttal, however, the State introduced social media messages between Kirby and Victim's daughter in which Kirby acknowledged that sometimes Victim's actions made him "so angry and hurt" that he "would haul off and hit her."

¶15    On the last scheduled day of trial, Kirby's counsel informed the trial court that he had a witness (Witness), Victim's most recent ex-boyfriend, who was out-of-state but who could testify that Victim confessed that she had made the whole thing up. The trial court decided not to allow any evidence from

Witness. The court did so because Witness's testimony, as outlined by defense counsel, was inadmissible hearsay. Because Victim had not been questioned about her statements to Witness during cross-examination, Witness's proposed testimony recounting what Victim allegedly told him could not come in as a prior inconsistent statement by Victim. The court also learned that Witness had cooperated with the State until he and Victim ended their relationship, and only then did he cooperate with the defense, making it unlikely that the jury would view his testimony as credible. Further, the court concluded that it was "too late" in the trial to introduce Witness's testimony. Kirby's counsel moved for a mistrial, contending that the new testimony might establish his client's innocence. Although no explicit ruling on the motion appears in the record, because no mistrial was granted it can properly be assumed that the trial court denied the motion.

¶16    The jury convicted Kirby of all three offenses with which the State had charged him—aggravated kidnapping, aggravated assault, and tampering with a witness. Kirby now appeals.

ANALYSIS

I. Kirby's Counsel Did Not Provide Ineffective Assistance by Failing To Move for a Directed Verdict.

¶17    Kirby challenges the sufficiency of the evidence for each of the three charges against him. He acknowledges that this claim was not preserved and urges that we review his argument under the rubric of ineffective assistance of counsel, arguing that it was ineffective assistance for defense counsel not to move for a directed verdict on each charge. "Ineffective assistance . . . is an exception to the preservation rule," *State v. Johnson*, 2015 UT App 312, ¶ 15, 365 P.3d 730, which may be raised for the first time on appeal, *see State v. Low*, 2008 UT 58, ¶ 19, 192 P.3d 867. But

winning reversal on ineffective-assistance grounds is difficult because "a defendant must prove both that counsel's performance was objectively deficient and that it resulted in prejudice" and because "failure to prove either element defeats the claim." *Johnson*, 2015 UT App 312, ¶ 15 (citation and internal quotation marks omitted).

¶18    Because "a finding that a defendant is guilty beyond a reasonable doubt is necessarily a finding that any alternative hypothesis of innocence presented at trial was *not* reasonable under the jury's view of the evidence," *State v. Cardona-Gueton*, 2012 UT App 336, ¶ 12, 291 P.3d 847 (emphasis in original), defendants appealing their convictions must do more than simply re-characterize the State's evidence as unreliable while simultaneously restating the evidence they presented below in the light most favorable to themselves. This is especially true given that "[a]s long as there is *some evidence* from which all the necessary elements of the charged offenses can be proved, there is sufficient evidence to find the defendant guilty beyond a reasonable doubt." *Johnson*, 2015 UT App 312, ¶ 11 (emphasis added). We conclude that the State introduced "some evidence" as to each of the essential elements of each charge brought against Kirby. *See id.*

A.    There Was Sufficient Evidence To Convict Kirby of Aggravated Kidnapping.

¶19    As to his aggravated kidnapping conviction, Kirby appears to challenge only the sufficiency of the evidence to prove that Victim was restrained or detained.[4] He proposes that

---

4. Even if Kirby had challenged the sufficiency of the evidence relating to the factors that gave rise to the aggravated nature of the kidnapping charge, we would still affirm because Victim's testimony established that Kirby "act[ed] with intent . . . [both]

(continued…)

because Victim had opportunities to escape, of which she did not avail herself, she was not unlawfully detained and that he therefore cannot be found to have kidnapped her. This argument is a red herring because once a person's conduct meets the statutory definition of "kidnapping," *see* Utah Code Ann. § 76-5-301(1)(a) (LexisNexis 2012) ("An actor commits kidnapping if the actor intentionally or knowingly, . . . and against the will of the victim . . . detains or restrains the victim for any substantial period of time[.]"), even taking subsequent affirmative steps to release the captive—which Kirby did not do—would not make the person any less criminally liable for the completed kidnapping that preceded the release. It has long been recognized that a person cannot "unkidnap" another, any more than one can "unmurder" or "unassault" someone. *See* William Ellis, *Where Must We Look for the Further Prevention of Crime?* 18 (1857) ("[C]riminal acts once committed cannot be undone."). In other words, Kirby cannot benefit from the fact that he so terrorized Victim that she declined to escape the motel room after he demonstrated a willingness to severely beat her for attempting to do so.

¶20   Victim testified that after Kirby beat her the first time, she begged him to allow her to leave—but he refused. This was an illegal detention. *See State v. Couch*, 635 P.2d 89, 93 (Utah 1981) (noting that a person is illegally detained once "the detention begins to be 'against the will of the victim'") (quoting Utah Code Ann. § 76-5-301(1)(a)). An illegal detention becomes a kidnapping once the victim is detained "for a 'substantial period'"—

---

(…continued)

to hinder or delay the discovery of or reporting of a felony [and] to inflict bodily injury on or to terrorize [Victim]." *See* Utah Code Ann. § 76-5-302(1) (LexisNexis Supp. 2016). We will further address both of these points as they arise in our subsequent discussion of Kirby's other two convictions. *See infra* ¶¶ 22–26.

"substantial period" being a term of art that "can be defined only by reference to [the] specific fact situation."[5] *Couch*, 635 P.2d at 93.

¶21    After Victim lay down on a bed near the exterior door of the motel room, Kirby ordered her to move to another bed. Because Kirby had finished his initial assault of Victim by then, this statement can reasonably be interpreted as indicating Kirby's desire to prolong the illegal detention of Victim beyond what was inherent in the beating. The following day, Kirby left the motel room—but not before instructing Victim not to leave. Later, after Victim told him she was going to leave, he snatched the suitcase out of her hands, dumped it, and then beat her some more when she attempted to retrieve it. This demonstrated that the illegal detention was ongoing—at that time for more than a day. *See id.* Thus, regardless of whether Victim could have escaped her kidnapper at some earlier point than she ultimately did, the evidence of Kirby's conduct was sufficient to support his conviction for kidnapping.

B.    There Was Sufficient Evidence To Convict Kirby of Aggravated Assault.

¶22    Kirby further maintains that the evidence was insufficient to prove he committed an aggravated assault against Victim because (1) Victim's "testimony was too unreliable to support the State's charges" and (2) Victim did not suffer "serious bodily injury." We disagree.

---

5. Although we hold that Kirby confined Victim for a substantial period and thus committed a "kidnapping," *see infra* ¶ 21, a person may also be convicted of aggravated kidnapping if he or she commits an "unlawful detention" accompanied by one or more of the aggravating factors listed in Utah Code section 76-5-302, *see* Utah Code Ann. § 76-5-302(1)(a)–(b) (LexisNexis Supp. 2016).

¶23    In *State v. Robbins*, 2009 UT 23, 210 P.3d 288, the Utah Supreme Court noted that appellate courts generally "accept the jury's determination of witness credibility, [except] when the witness's testimony is *inherently improbable*." *Id.* ¶ 16 (emphasis added). In *Robbins*, the witness's own account was internally inconsistent and included impossible characterizations. *Id.* ¶¶ 21–23. But here the only inconsistencies in Victim's testimony to which Kirby has pointed are that at the preliminary hearing Victim stated that Kirby did not kick her with his foot, but at trial she testified that he did, and at the preliminary hearing Victim said that Kirby dented the wall with his bare foot, but at trial she testified that she was unsure whether his foot was bare at the time. Even together, these discrepancies are not determinative of Victim's credibility and, indeed, could readily be interpreted by the jury as resulting from the trauma she experienced rather than as suggesting that she was not a credible witness. *Id. See also* Lynn Abrams, *Oral History Theory* 94 (2d ed. 2016) ("Often the events being recalled [by trauma survivors] are distant and difficult to express in words. We should expect such testimony to contain some inaccuracies without compromising the value of the testimony as a whole."). And although Kirby makes much of the fact that Victim ingested some drugs that he did not, evidence of illegal drug abuse, without further proof that the drugs used were likely to affect the witness's memory or perception of events, does not make a witness's statement "inherently improbable." *See State v. Hales*, 2007 UT 14, ¶ 36, 152 P.3d 321 (citation and internal quotation marks omitted).

¶24    Furthermore, contrary to Kirby's contention, it is clear that Victim's injuries were sufficiently severe to warrant the aggravated assault conviction. *See* Utah Code Ann. § 76-5-103(1)(a)(iii) (LexisNexis Supp. 2016). Given that two severely blackened eyes, *see State v. Anselmo*, 558 P.2d 1325, 1327 (Utah 1977); a torn rotator cuff, *see State v. Hale*, 2006 UT App 434U, para. 6; temporary unconsciousness, *see State v. Bloomfield*, 2003 UT App 3, ¶¶ 2–3, 18, 63 P.3d 110; and a broken jaw, *see State v.*

*Leleae*, 1999 UT App 368, ¶ 20, 993 P.2d 232, each qualify as a "serious bodily injury" under Utah law, then so does the combination of deep bruising across Victim's entire body, the laceration to the back of her head accompanied by further bruising and swelling, strangulation so severe as to leave physical manifestations hours later, and a fractured orbital bone causing continual migraines. *See* Utah Code Ann. § 76-1-601(11) (LexisNexis 2012) (defining serious bodily injury as "bodily injury that creates or causes serious permanent disfigurement, protracted loss or impairment of the function of any bodily member or organ, or creates a substantial risk of death"). The mere fact that Victim happened to be strong enough to fall into bed after being beaten, strangled, and stomped upon and later, after resting for a day, to limp from the motel room to a nearby bus stop, does not transform a serious injury into a nonserious one.

C.    There Was Sufficient Evidence To Convict Kirby of Tampering with a Witness.

¶25    Victim testified that Kirby repeatedly made statements to the effect that he would not, or could not, allow her to leave, because he would "go to prison" if she called the police, given that "he [had] really fucked [her] up this time." To support a conviction of witness tampering, Utah Code section 76-8-508(1) requires only that the person, "with the intent to *prevent* an official proceeding or investigation, . . . attempt[ed] to induce or otherwise cause another person to . . . withhold any testimony, information, document, or item." *Id.* § 76-8-508(1)(b) (emphasis added). *See also State v. Peterson*, 2015 UT App 129, ¶ 12, 351 P.3d 812 (holding that "evidence was sufficient for the jury to infer that [the defendant] threatened [the witness] with the intent to prevent an official proceeding or investigation" after the defendant promised to retaliate against the witness if she revealed the defendant's improper behavior). Considering Kirby's statements that Victim could not leave "because he [had]

really fucked [her] up this time" and that he would "go to prison" if Victim spoke to police, it is evident Kirby intended to prevent just such "an official proceeding or investigation." *See id.*

¶26    In sum, there was sufficient evidence against Kirby to convict him of each offense of which he was convicted, so a motion to dismiss for insufficient evidence would have been futile. *See State v. Johnson*, 2015 UT App 312, ¶¶ 15–16, 365 P.3d 730 (concluding that defense counsel did not provide ineffective assistance by not moving for dismissal based on insufficient evidence where there was sufficient evidence to support defendant's conviction). "Because the failure to file a futile motion is not an error," we conclude that defense counsel did not provide "objectively deficient" assistance to Kirby. *See id.*

## II. The Trial Court Did Not Err in Refusing To Grant a Continuance To Allow Kirby Time To Procure the Testimony of Witness.

¶27    We assume, without deciding, that Kirby preserved his argument on this issue even though he did not expressly request a continuance. *See Peterson*, 2015 UT App 129, ¶ 2 n.1. Because the trial court's decision concerning the requested continuance was legally correct, we affirm.[6] *See id.*

¶28    We begin (and end) our discussion with the following premise: "When a defendant in a criminal action moves for a continuance in order to procure the testimony of an absent witness, such a defendant must show that the testimony sought is material *and admissible*." *State v. Creviston*, 646 P.2d 750, 752 (Utah 1982) (emphasis added). In other words, if the additional

---

6. In view of this conclusion, we have no occasion to address the various other factors that the trial court mentioned in the course of considering whether Kirby would be allowed to call Witness.

evidence a party seeks to introduce is *not* admissible, whether barred by the hearsay rule or on some other basis, then a continuance to procure it is never warranted. *Id.*

¶29 Hearsay is any statement that (1) the declarant—the "person who made the statement"—did "not make while testifying at the current trial or hearing; and [that] (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Utah R. Evid. 801(b), (c)(1)–(2). Such a statement is only admissible if the rules of evidence categorize it as "not hearsay," *see id.* R. 801(d), or if an explicit exception to the hearsay rule allows for the introduction of the hearsay statement at issue, *see id.* R. 802.[7] The exception urged by Defendant allows for the introduction of a witness's prior inconsistent statement, but this exception requires that the declarant both "testifies and *is subject to cross-examination about* [the] prior statement" before the statement can be introduced. *See id.* R. 801(d)(1) (emphasis added).

¶30 With the foregoing rules in mind, the issue effectively resolves itself. Would Witness's testimony about a statement Victim purportedly made out of court have been hearsay? Yes. *See id.* R. 801(c). Would it have been *admissible* hearsay? No. Although Victim did testify, she was not cross-examined about her alleged prior statement to Witness. *See id.* R. 801(d)(1). Thus, given that Witness's proposed testimony would have been inadmissible under the prior inconsistent statement exception, the trial court did not err in declining to permit Kirby to call

---

7. Although the Utah Rules of Evidence distinguish between statements that are by definition "not hearsay" and statements that come in under an exception to the hearsay rule, any distinction between these two categories does not affect our analysis. Thus, we simply use the term "exception" in our discussion.

Witness or in granting Kirby a continuance so that he could do so. *See Creviston*, 646 P.2d at 752.

CONCLUSION

¶31 Because there was sufficient evidence to convict Kirby of all three charges brought against him, defense counsel's failure to move for a directed verdict was not objectively deficient performance. Furthermore, whether or not Kirby preserved the argument, the trial court properly declined to grant Kirby a continuance because the evidence he sought to present was inadmissible.

¶32 Affirmed.

_____