**2019 UT App 29**

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF G.D.B.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

G.D.B.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20170257-CA
Filed February 22, 2019

Third District Juvenile Court, Salt Lake Department
The Honorable Julie V. Lund
No. 1135749

Monica Maio and Alicia M. Memmott,
Attorneys for Appellant

Sean D. Reyes, Nathan D. Anderson, and Mikelle C.
Daugherty, Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

MORTENSEN, Judge:

¶1     G.D.B., a minor, appeals the juvenile court's adjudication
finding him delinquent on one count of sexual abuse of a child
for touching his four-year-old niece's vagina and trying to put
his penis "in [her] bum." G.D.B. argues that the State failed to
prove the touching was done with the intent to arouse or gratify
G.D.B.'s sexual desires, as required by Utah Code section
76-5-404.1. We affirm.

BACKGROUND[1]

*Revelation of Abuse*

¶2 G.D.B. was seven-and-a-half years older than the four-year-old victim, his niece (Victim).[2] G.D.B. and Victim spent a lot of time together. Victim's mother (Mother) babysat G.D.B. and took him on outings with Victim. On most weekends, Victim stayed with her grandmother (Grandmother), who is G.D.B.'s mother. Victim usually slept in Grandmother's room, but she claimed she occasionally slept in the living room, where G.D.B. also slept. Although Grandmother was always nearby in the apartment, G.D.B. and Victim were sometimes alone in the same room together.

¶3 One evening in February or March 2016, Victim and Mother were watching a television show about people trying to survive naked in the wild. Victim asked Mother, "[W]hy are their private parts fuzzed out?" Mother answered, "[B]ecause private parts are . . . for them to see and not for the world to see." Victim responded, "[W]ell, [G.D.B.] always wants to see my private parts." Victim then revealed to Mother that G.D.B. touched her vagina and assured Mother that she was telling the truth.

¶4 After hearing Victim's account, Mother no longer allowed Victim to stay at Grandmother's apartment. While she missed visiting Grandmother, Victim did not want to see G.D.B. Victim said that she felt "safe" around G.D.B. only when others were

---

1. "On appeal from a bench trial, we view the evidence in the light most favorable to the trial court's findings." *State v. Whitaker*, 2016 UT App 104, ¶ 2, 374 P.3d 56.

2. Victim was between four- and four-and-a-half-years old and G.D.B. was between eleven-and-a-half and a few weeks shy of his twelfth birthday when the incidents of abuse occurred.

present because "she knew [G.D.B.] wouldn't [touch her inappropriately] in front of somebody else." Mother reported the incident to Child Protective Services (CPS).

¶5    About a month later, while using the bathroom on a camping trip, Victim asked Mother how boys urinate. Mother explained that boys have different body parts. Victim responded, "I know they have a penis . . . . [G.D.B.] always tried to stick his penis in me." When Mother asked where on her body, Victim indicated her vagina. Mother also disclosed this information to CPS.

*Investigation of Abuse*

¶6    In June 2016, a special victim's investigator (Investigator) interviewed Victim at the Children's Justice Center (CJC) about the abuse she had revealed to Mother. According to Investigator, Victim was "developmentally able to communicate accurately about the situation." Victim said that G.D.B. touched "her private parts," defined by Victim as her vagina and buttocks, more than once. Victim revealed that G.D.B. touched her with his hands over her clothing. Victim also stated that she repeatedly tried to stop G.D.B. from touching her, but G.D.B. refused to stop.

¶7    Shortly after the CJC interview, Victim received a medical examination conducted by a nurse practitioner (Nurse) specializing in sexual abuse exams. Victim told Nurse that G.D.B. had touched "her front part" with his hands under her clothes and that the touching hurt.

¶8    Although Victim's physical examination was normal and showed no signs of abuse, Nurse determined that Victim "had a significant history that was positive for sexual abuse" based on Victim's answers to Nurse's questions. Nurse clarified that a normal exam does not rule out sexual abuse, because "95 percent of children who make allegations of sexual abuse have normal exams."

¶9     Based on the CJC interview and the medical exam, the State filed a petition alleging that G.D.B. had sexually abused Victim in violation of Utah Code section 76-5-404.1. The relevant subsection of the statute provides:

> An individual commits sexual abuse of a child if, under circumstances not amounting to rape of a child, object rape of a child, sodomy on a child, or an attempt to commit any of these offenses, the actor touches the anus, buttocks, pubic area, or genitalia of any child, the breast of a female child, or otherwise takes indecent liberties with a child, with intent to cause substantial emotional or bodily pain to any individual or with the intent to arouse or gratify the sexual desire of any individual regardless of the sex of any participant.

Utah Code Ann. § 76-5-404.1(2) (LexisNexis Supp. 2018).[3]

*Testimony at Trial*

¶10    At trial, Victim testified that G.D.B. "put his finger in [her] vagina . . . . [o]ne time" and "his penis in [her] bum . . . . all the time, every single time" she would stay at Grandmother's apartment. This abuse occurred in the living room, where G.D.B. slept and where Victim claimed that she sometimes also slept.

¶11    G.D.B. admitted that he and Victim were sometimes left alone together. But he denied that he and Victim slept in the same room. He also said that he had never touched Victim "inappropriately," played "house" or "doctor" with her, accidentally touched her private parts, changed her clothes,

---

3. Because the statutory provisions in effect at the relevant time do not differ in any material way from those now in effect, we cite the current version of the Utah Code.

helped her use the bathroom, given her a bath, or seen her naked.

¶12 Grandmother testified that Victim and G.D.B. never slept in the same room together, Victim was never alone with G.D.B., and Victim never told her that G.D.B. touched her.[4]

*Disposition in the Juvenile Court*

¶13 G.D.B. made two points in closing argument. First, he argued that Victim was not a credible witness, alleging that inconsistencies in Victim's statements at the CJC interview, during the medical examination, and at trial discredited her testimony. Second, G.D.B. asserted that the State had failed to prove the sexual intent element:

> [Utah Code section 76-5-404.1(2)] has an intent element. It's not just touching. There has to be touching the breast, the anus, the butt of a child, with the intent to arouse or gratify, to cause substantial bodily, emotional or bodily pain. There's been no evidence whatsoever that the State has put on that has met that intent element, zero evidence. There is absolutely no physical evidence.

Counsel concluded by arguing that the State had failed to meet its burden of proof generally. Counsel, however, never asserted that G.D.B.'s age or immaturity affected his ability to form a sexual intent and never specifically asked the juvenile court to consider his age in rendering its decision.

¶14 In its closing argument, the State countered that Victim's testimony was credible even though some of the "details [got]

---

4. In the CJC interview, Victim stated that she told Grandmother that G.D.B. had touched her inappropriately, and that Grandmother had "gotten mad" at G.D.B.

mixed up." The State asserted that "inconsistencies in [Victim's] statement about what happened . . . can be attributed to how many times this happened to her, and how she in her mind, her five-year-old mind, she can't distinguish, and she can't articulate the different times this happened, because it happened so many times."

¶15 The State further argued that sexual intent could be inferred from the circumstances of the touching, and it emphasized that G.D.B. offered no innocent explanation for any touching. Specifically, the State argued that "this touching did not happen during bathing, did not happen during changing clothes, did not happen when [G.D.B.] helped [Victim] use the bathroom or to help wipe her." The State urged the court to "turn to what was happening when this touching happened." G.D.B. and Victim "were alone in the living room. [G.D.B.'s] intent can be inferred from his actions at that time. What other intent would he have to be touching [Victim] on her vagina with . . . his hands, or touching her butt with his penis, if it's not to sexually gratify himself?"

¶16 Immediately after closing arguments, the court took a recess expressly to consider the issue of intent. Upon reconvening, the court acknowledged inconsistencies in Victim's account. But, "given that she's five years old," the court determined there was "some credibility" to her testimony to support the conclusion that G.D.B. touched Victim.

¶17 The court further stated that, in addition to reviewing applicable code provisions, it had looked at the decisions of *In re D.M.*, 2013 UT App 220, 310 P.3d 741, and *In re J.S.*, 2012 UT App 340, 292 P.3d 709. The court explained that "while intent is difficult to ascertain," these cases support the proposition that "it is appropriate to infer intent from conduct and life experience." G.D.B. did not take issue with the court's summary of the law. The juvenile court then concluded that G.D.B. "took indecent liberties with [Victim], and . . . the only []possible intent that

[G.D.B.] could have in doing this was to arouse or gratify his sexual desires." Based on this reasoning, the juvenile court concluded that the State had "proven the allegation beyond a reasonable doubt" and found G.D.B. delinquent. G.D.B. appeals.

ISSUE AND STANDARD OF REVIEW

¶18    G.D.B. contends that the juvenile court erred in deciding there was sufficient evidence of sexual intent. "When reviewing a bench trial for sufficiency of evidence, we must sustain the trial court's judgment unless it is against the clear weight of the evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made." *State v. Miller*, 2017 UT App 171, ¶ 7, 405 P.3d 860 (cleaned up).

ANALYSIS

¶19    The pertinent elements of sexual abuse of a child are (1) "touch[ing] the anus, buttocks, pubic area, or genitalia of any child" (2) "with the intent to arouse or gratify the sexual desire of any individual." Utah Code Ann. § 76-5-404.1(2) (LexisNexis Supp. 2018). "The State bears the burden of proving each and every element of a criminal offense beyond a reasonable doubt." *State v. Whitaker*, 2016 UT App 104, ¶ 11, 374 P.3d 56.

A.    Inappropriate Touching of Victim

¶20    As G.D.B. acknowledges in his brief, the juvenile court found Victim's testimony credible. "Because the juvenile court is in an advantaged position with respect to the parties and the witnesses, we do not disturb its determinations of the witnesses' credibility." *In re S.Y.T.*, 2011 UT App 407, ¶ 51, 267 P.3d 930 (cleaned up). G.D.B. concedes that, given the deference afforded to trial courts in making credibility determinations, the State met its burden in establishing the first element of sexual abuse of a child.

B.      Inference of G.D.B.'s Sexual Intent

¶21    But G.D.B. argues that the juvenile court erred in its determination that the second statutory element—that G.D.B. acted with the requisite sexual intent—was met. G.D.B. asserts that the State offered no direct evidence of sexual intent. "Although [G.D.B.] is correct that there was no direct evidence of his intent to gratify or arouse a sexual desire, intent is a state of mind, which is rarely susceptible of direct proof." *See In re D.M.*, 2013 UT App 220, ¶ 10, 310 P.3d 741 (cleaned up); *see also State v. Robertson*, 2005 UT App 419, ¶ 15, 122 P.3d 895 (same). Given the rarity of direct evidence showing the intent to gratify, intent "can be inferred from conduct and attendant circumstances in the light of human behavior and experience." *In re D.M.*, 2013 UT App 220, ¶ 10 (cleaned up); *see also State v. Holgate*, 2000 UT 74, ¶ 26, 10 P.3d 346 ("[I]ntent may be proven by circumstantial evidence and reasonable inferences drawn therefrom, and intent is rarely established by direct evidence."); *In re J.S.*, 2012 UT App 340, ¶ 5, 292 P.3d 709 ("Intent is a state of mind that can be inferred from a person's conduct viewed in light of all the accompanying circumstances. It is well established that intent can be proven by circumstantial evidence." (cleaned up)). And as this court recently noted, "[s]uch inferences are routinely employed in cases requiring proof of sexual intent." *In re D.M.*, 2013 UT App 220, ¶ 10.

¶22    G.D.B. argues that the State has also failed to provide any circumstantial evidence that he acted with sexual intent. G.D.B. concedes that "a touching of [genitalia] occurring between an adult and child could reasonably give rise to an inference of intent because there is 'no conceivable explanation for the circumstances . . . other than to arouse or gratify the sexual desire of any person.'" (Quoting *State v. Tueller*, 2001 UT App 317, ¶ 20, 37 P.3d 1180.) But G.D.B. argues that an inference of sexual intent "cannot and should not always be made when the touching occurs between two children. Rather, in cases where . . . the alleged offender is also a child under the age of consent,

courts must consider that child's age, maturity, and sexual development in determining whether the State has proven that the child acted with the requisite sexual intent." G.D.B. argues that "there is nothing in the record to suggest that the juvenile court made those considerations." We disagree.

¶23    The record here reflects that under both controlling law and the circumstances of this particular case, the juvenile court had a reasonable basis to infer G.D.B.'s intent to arouse or gratify his sexual desires. In large measure, we see this issue as controlled by *In re D.M*, a case in which an eleven-year-old touched the genitalia of a nine-year-old victim, and we concluded that sexual intent could be inferred from the circumstances. 2013 UT App 220, ¶ 11.[5] During a sleepover, D.M. dared his victim to crawl under a futon. *Id.* ¶ 2. D.M. joined him and asked him to remove his pants. *Id.* When the victim refused, D.M. pulled down the victim's pants and touched victim's genitals for a short period of time. *Id.* The juvenile court adjudicated D.M. delinquent on sexual abuse of a child. *Id.* ¶ 1. On appeal, D.M. argued that there was insufficient evidence of sexual intent. *Id.* ¶ 9. A panel of this court determined that, "[i]n light of D.M.'s conduct in exposing and touching [the victim's] testicles and the attendant circumstances," the juvenile court's inference of sexual intent was not "so flawed as to render the inference clearly erroneous." *Id.* ¶ 11 (cleaned up). D.M. further argued "that the ordinary standards for inferring sexual intent

---

5. We note, as G.D.B. acknowledged at oral argument, that G.D.B. did not argue below and has not asserted in his briefs on appeal that we should overturn, modify, or otherwise revisit *In re D.M.*, 2013 UT App 220, 310 P.3d 741. We recognize that arguments to do so may exist in light of recent decisions such as *J.D.B. v. North Carolina*, 564 U.S. 261 (2011), which held that a minor's age must be considered in determining custody status and entitlement to a *Miranda* admonition. But such issues are not squarely before us here.

are insufficient to establish *his* intent because he was only eleven years old at the time of the offense." *Id.* ¶ 12. But the panel in *In re D.M.* concluded that there was "no indication that the juvenile court failed to consider D.M.'s young age in determining that he possessed the requisite intent." *Id.* That panel also noted that D.M. presented "no Utah authority for the proposition that an eleven-year-old cannot possess sexual intent as a matter of law, nor did [D.M.] present evidence below that eleven-year-olds in general—or himself in particular—are incapable of forming sexual intent." *Id.* Likewise, G.D.B presented no such evidence here.

¶24    G.D.B. argues that *In re D.M.* is factually distinguishable. First, he points out that D.M.'s victim was said to be "scared" and "very credible." *See In re D.M.*, 2013 UT App 220, ¶ 11. G.D.B. asserts that there was no evidence that Victim was scared and the juvenile court found her only "somewhat credible." Second, G.D.B. argues that the *In re D.M.* court concluded that there was no indication that the juvenile court had failed to consider D.M.'s young age in determining he possessed sexual intent. *See id.* ¶ 12. G.D.B. asserts that his case differs because there was no evidence that the juvenile court considered G.D.B.'s age and or maturity at all. We find neither attempt to distinguish *In re D.M.* from the present case persuasive for three reasons.

¶25    First, whether a victim must be "scared" by a sexual abuser's conduct is irrelevant. The issue is the intent of the abuser, not how the abuse makes the victim feel. Furthermore, even if a victim's feelings were somehow relevant, there is ample evidence that Victim did not like G.D.B.'s touching. She avoided being alone with G.D.B. She said the touching "hurt" her, and she repeatedly tried to stop G.D.B. While Victim did not say she was "scared," there is certainly evidence that she found G.D.B.'s touching intrusive and unwelcome.

¶26    Second, the *strength* of Victim's credibility is not the key issue disputed in this case. As G.D.B. admitted, the juvenile

court found Victim to be credible. With regard to credibility issues, this court defers "to the juvenile court because of its advantaged position with respect to the parties and the witnesses in assessing credibility and personalities." *In re J.C.*, 2016 UT App 10, ¶ 13, 366 P.3d 867 (cleaned up); *see also In re S.Y.T.*, 2011 UT App 407, ¶ 51, 267 P.3d 930 ("Because the juvenile court is in an advantaged position with respect to the parties and the witnesses, we do not disturb its determinations of the witnesses' credibility." (cleaned up)). In the present case, the juvenile court, despite having some reservations about Victim's credibility, ultimately determined that Victim was more credible than G.D.B. and Grandmother. And the juvenile court expressly found that quantum of evidence sufficient to meet the reasonable doubt standard.

¶27 Third, in arguing that the juvenile court failed to consider G.D.B.'s age and maturity, G.D.B. ignores the obvious fact that his case was heard in a juvenile court. The *raison d'être* of the juvenile court system is to provide a suitable forum for young offenders. As our courts have repeatedly asserted, juvenile courts provide a "tribunal geared toward the special needs of youth offenders." *State v. Schofield*, 2002 UT 132, ¶ 17, 63 P.3d 667; *see also In re K.M.*, 2007 UT 93, ¶ 41, 173 P.3d 1279 (Wilkins, J., concurring) (stating that the difference between children and adults is "the single most important motivation for the establishment of a separate juvenile court system"). Juvenile court judges are "steeped in the policy and theory of juvenile justice." *In re K.M.*, 2007 UT 93, ¶ 39 (Wilkins, J., concurring). And, "[r]ecognizing the differences in adult and juvenile behavior and culpability," our supreme court has held that juvenile courts "take age, experience, and emotional maturity into consideration when considering [a minor's] ability to give consent, waive rights, and suffer consequences." *R.G. v. State*, 2017 UT 79, ¶ 15, 416 P.3d 478.

¶28 Thus, owing to the very nature of the juvenile court system, we may presume, in the absence of any indication to the

contrary, that the juvenile court in this case appropriately considered G.D.B.'s age and maturity in reaching its adjudication. *See In re D.M.*, 2013 UT App 220, ¶ 12 (noting that "we see no indication that the juvenile court failed to consider [the juvenile's] young age in determining that he possessed the requisite intent"). While it would certainly be helpful for juvenile courts to make explicit their consideration of the juvenile's age and maturity in reaching their conclusions regarding a juvenile's sexual intent, and we encourage juvenile courts to do so, the absence of an express finding along these lines does not necessarily render the juvenile court's decision reversible.

CONCLUSION

¶29    We conclude that the record contains sufficient evidence to support the juvenile court's adjudication and that the juvenile court could infer the requisite sexual intent. Accordingly, we affirm.

———————