**2020 UT App 103**

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF J.A.M.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

STATE OF UTAH,
Appellee,
*v.*
J.A.M.,
Appellant.

Opinion
No. 20180610-CA
Filed July 2, 2020

Third District Juvenile Court, Salt Lake Department
The Honorable Susan Eisenman
No. 1083963

Monica Maio, Marina Pena, and Monica Diaz,
Attorneys for Appellant

Sean D. Reyes and Nathan H. Jack, Attorneys
for Appellee

JUDGE KATE APPLEBY authored this Opinion, in which JUDGES JILL
M. POHLMAN and RYAN M. HARRIS concurred.

APPLEBY, Judge:

¶1      The juvenile court adjudicated J.A.M. delinquent for aggravated kidnapping. On appeal, J.A.M. contends there was insufficient evidence to establish the intent to commit a sexual offense and that the court erroneously inferred that intent. We affirm.

BACKGROUND[1]

¶2     Fifteen-year-old J.A.M. and seventeen-year-old K.G. (Victim) were at their high school after hours. The two were captured on surveillance video "hugging, kissing, and [lying] on top of each other" on the school's third floor landing. Victim testified that, during this time, she told J.A.M. to stop, "but he didn't" and he "didn't say anything." She then "tried to" push him away, "but he didn't get off" her. After approximately ten minutes, Victim said she successfully pushed J.A.M. off her, and they went downstairs to the first floor.

¶3     On the first floor, Victim went to the women's restroom, where she spent between two and ten minutes. There was no surveillance footage of the hallway near the restroom. Victim testified that, when she exited the restroom, she "saw [J.A.M.] and he had his genitals out." Specifically, Victim said she could see the "shape of his penis," which was "under his shirt" but out of his pants, and she could see "the bump," which she did not see when they were kissing on the third floor. During cross-examination, Victim maintained she could see J.A.M.'s penis "under his shirt" but not "under his pants," although she acknowledged she could not see the top of his pants.

¶4     At that point, Victim said J.A.M. "tried to grab" her from behind by placing both of his hands around her stomach. Victim "told him to stop, but he didn't." J.A.M. did not say anything as he pulled her "backwards towards the bathroom." Eventually, Victim fell and J.A.M. grabbed her feet and tried to drag her into the restroom. Victim "tried to" resist and "told him to stop" throughout the episode, which lasted approximately ten minutes before Victim was able to run away.

---

1. "On appeal from a bench trial, we view the evidence in the light most favorable to the [juvenile] court's findings." *In re G.D.B.*, 2019 UT App 29, n.1, 440 P.3d 706 (quotation simplified).

¶5 J.A.M. was charged in juvenile court with aggravated kidnapping on the basis that, while committing an unlawful detention, he acted with the intent to commit a sexual offense. *See* Utah Code Ann. § 76-5-302(1)(b)(vi) (LexisNexis Supp. 2019).[2] The case proceeded to a bench trial, where Victim testified to the events described above.

¶6 After the State rested, J.A.M. moved for a directed verdict, arguing the State did not meet its burden of proof. Specifically, J.A.M. argued "the State ha[d not] presented any evidence of intent that would lead one to believe any of [the enumerated] crimes [that constitute a sexual offense] were going to be committed or that it was the intent to commit any of those crimes." The State opposed the motion, arguing that "intent can be implied by multiple other factors" and that J.A.M. "had pulled his privates out of his pants," tried to "drag [Victim] into a secluded area where no one else could see against her will," while Victim "repeatedly . . . told him to stop." This, the State argued, was sufficient to infer J.A.M.'s "intent . . . to commit a forcible sex offense . . . because he was committing the unlawful detention while pulling her into the bathroom against her will, while having his genitals exposed." The court denied the motion because there was "sufficient evidence of intent to commit a sexual offense based on the only testimony [given] so far, which is that [J.A.M.'s] pants were down and he was dragging [Victim] by her feet."

¶7 After trial, the court determined "beyond a reasonable doubt that even though . . . Victim got away before any sexual offense actually occurred," J.A.M. "committed the offense of Aggravated Kidnapping." The court noted Victim and J.A.M.

---

2. Because the statutory provisions in effect at the relevant time do not differ in any way material to our analysis from those now in effect, we cite the current version of the Utah Code for convenience.

"were engaged in sexual activity on the 3rd floor landing" of the high school, specifically "hugging, kissing, and [lying] on top of each other." After reviewing the surveillance footage, the court could not determine that this activity was nonconsensual beyond a reasonable doubt but did "not find that it matter[ed]." And although the court recognized there were inconsistencies between the video and Victim's testimony, it found Victim credible.

¶8 Regarding the attack on the first floor, the court found J.A.M. "was waiting for" Victim as she exited the restroom and his "penis was obvious to . . . Victim where it had not been obvious before." Although the court could not "find beyond a reasonable doubt whether [J.A.M.'s] pants were unbuttoned or unzipped . . . , it was immediately obvious to . . . Victim that [his] penis was protruding and more visible than it was before." The court also found J.A.M. "grabbed [Victim] from behind and tried to get her into the bathroom," despite her saying, "stop" and "no," and that when Victim fell, J.A.M. "grabbed her feet and tried to pull her into the bathroom" before she was able to run away.

¶9 These factual findings led the court to conclude that (1) by grabbing Victim and trying to drag her to the restroom, J.A.M. "prevented [her] from leaving the area"; (2) "[t]he outline of [J.A.M.'s] penis was visible to [Victim] and was out of his pants but covered by his shirt"; (3) the fact that "his penis was out of his pants and visible indicate[d] sexual arousal from which an intent to commit some kind of sexual offense of forcible sexual abuse can be inferred"; (4) while an inference "that rape was about to occur" was not justified, an inference "that some kind of sexual act sufficient to meet the statutory requirements [of forcible sexual abuse] was about to occur" was justified; and (5) Victim said "no" and "stop," tried to get away, and ultimately succeeded in escaping. Accordingly, the court adjudicated J.A.M. delinquent as charged. He timely appeals.

ISSUES AND STANDARDS OF REVIEW

¶10 On appeal, J.A.M. concedes an unlawful detention occurred, but he contends there was insufficient evidence to conclude he had the intent to commit a sexual offense, which elevated the crime to aggravated kidnapping. "When reviewing a bench trial for sufficiency of evidence, we must sustain the [juvenile] court's judgment unless it is against the clear weight of the evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made." *In re G.D.B.*, 2019 UT App 29, ¶ 18, 440 P.3d 706 (quotation simplified). "However, before we can uphold a conviction it must be supported by a quantum of evidence concerning each element of the crime as charged from which the factfinder may base its conclusion of guilt beyond a reasonable doubt." *In re K.O.*, 2010 UT App 155, ¶ 5, 238 P.3d 59 (quotation simplified).

¶11 J.A.M. also argues the juvenile court erroneously inferred that kissing and hugging on the third floor plus the visible "bump" of his penis established his intent to commit a sexual offense. "We will uphold a juvenile court's inferences unless the logic upon which their extrapolation from the evidence is based is so flawed as to render the inference clearly erroneous." *In re D.M.*, 2013 UT App 220, ¶ 9, 310 P.3d 741 (quotation simplified).

ANALYSIS

I. Sufficiency of the Evidence

¶12 J.A.M. argues the juvenile court erred in crediting Victim's testimony because it was inconsistent and inherently improbable. J.A.M. claims Victim was not a credible witness because she "misrepresented the truth . . . on the material issue of consent" regarding the kissing and hugging captured on

surveillance video from the third floor of the high school. J.A.M. also claims Victim gave what he characterizes as inherently improbable testimony and argues the court clearly erred when it found that J.A.M.'s penis was "out of his pants and visible" when Victim had testified to only a "bump." We address these arguments in turn.

A.    Victim's Credibility

¶13    J.A.M. argues Victim "misrepresented to the juvenile court that the kissing on the third floor was [not] consensual." This, he claims, renders her entire testimony incredible. "Because of the advantaged position of the juvenile court in assessing credibility and personalities, and also due to the juvenile court judges' special training, experience, and interest in their field and devoted attention to cases within their jurisdiction, we defer to the juvenile court and afford it wide latitude." *In re M.W.*, 2016 UT App 217, ¶ 11, 387 P.3d 557.

¶14    At trial, Victim was confronted about inconsistencies between her testimony that the third floor kissing and hugging was nonconsensual and the events shown on the surveillance video. During cross-examination, J.A.M.'s counsel showed the surveillance video and pointed out times where it appeared Victim rubbed J.A.M.'s back and hugged him. In response, Victim agreed she hugged him but she denied she rubbed his back and maintained she was pushing him and telling him to stop throughout.

¶15    Victim also was asked to clarify whether J.A.M.'s penis was outside his pants after she exited the restroom on the first floor. She maintained she could see his penis under his shirt but over his pants, although she was unable to see the top of his pants. J.A.M.'s counsel followed up by asking, "So you don't know if it was under his pants or not? Maybe you could see it through both?" Victim merely responded, "Yes." Counsel did not follow up for clarification.

¶16    Before making its ruling, the juvenile court said it "listened to the entirety of the evidence," "reviewed [Victim's] testimony," and watched the surveillance video. In its ruling, the court addressed the inconsistencies J.A.M. highlights on appeal. Specifically, the court noted that the video alternately showed Victim "hugging" J.A.M. "and tickling his back"—which the court said "appeared to be consensual or not adverse actions"—and then pushing J.A.M. away and turning "her head away from him on three occasions." After recognizing these inconsistencies, the court could not "find, beyond a reasonable doubt, that the activity on the 3rd floor was not consensual," but it did "not find that it matter[ed]" to its ultimate conclusion that what happened on the first floor amounted to aggravated kidnapping.

¶17    We agree with the juvenile court that whether what happened on the third floor was consensual was not outcome determinative. And even if Victim consented to the activity on the third floor, she was free to withdraw that consent at any time. *See, e.g.*, *State v. Nunes*, 2020 UT App 71, ¶ 31 ("It is immaterial at what point the victim withdraws consent, so long as that withdrawal is communicated to the defendant who thereafter ignores it." (quotation simplified)). This underscores the court's determination that whether the activity on the third floor was consensual did not affect its overall analysis—Victim could have withdrawn her consent at any time, and in fact she testified that she communicated she did not consent to what happened on the first floor. And the court's detailed findings and conclusions, which included the discrepancies in the video itself and between the video and Victim's testimony, demonstrate that the court "looked at the totality of the circumstances, weighed the evidence, and made decisions on the credibility of [Victim]." *See In re J.C.*, 2016 UT App 10, ¶ 29, 366 P.3d 867 (quotation simplified). Because "the juvenile court used its advantaged position to assess [Victim's] credibility," *see id.* ¶ 28 (quotation simplified), and given the broad discretion afforded the court in making credibility determinations, *see In re*

*M.W.*, 2016 UT App 217, ¶ 11, we discern no error in the juvenile court recognizing inconsistencies in Victim's testimony but nonetheless finding her credible.

B.    Inherent Improbability

¶18    J.A.M. next claims Victim gave what he characterizes as inherently improbable testimony that (1) Victim did not consent to the hugging and kissing on the third floor but she "willingly walked with [J.A.M.] to an isolated, dark area of the school on the first floor"; (2) she "immediately s[aw J.A.M.'s penis] 'bump' as she exited the restroom" while "at the same time [he] immediately grabbed her from behind" and waited for her outside the restroom instead of attacking her while she was inside; (3) J.A.M. would not show "signs of arousal on the third floor but would suddenly become aroused some twenty minutes later . . . waiting for [Victim] to use the restroom"; and (4) although there was nothing for Victim to grab onto while J.A.M. was pulling her, he was still "unable to move her into the restroom" after a ten-minute struggle. None of these contentions, alone or together, supports a finding of inherent improbability.

¶19    Because of the deference given to juvenile courts in their "ability and opportunity to evaluate credibility and demeanor," we deferentially review the court's "decision to decline to disregard a witness's testimony due to inherent improbability" and will reverse "only if it was clearly erroneous." *State v. Skinner*, 2020 UT App 3, ¶ 20, 457 P.3d 421 (quotation simplified).

¶20    The inherent improbability doctrine is "narrow" and "difficult to successfully establish . . . on appeal."[3] *Id.* ¶ 31

_____

3. Citing *State v. Doyle*, 2018 UT App 239, 437 P.3d 1266, the State contends this inherent improbability argument is unpreserved and we cannot reach it because J.A.M. did not argue plain error

(continued…)

(quotation simplified). To succeed on this "extremely rare exception," an appellant must demonstrate "(1) material inconsistencies in an individual's statements, (2) a complete lack of corroboration . . . , and (3) patent falsity in the witness's statements." *State v. Lyden*, 2020 UT App 66, ¶ 14; *see also State v. Prater*, 2017 UT 13, ¶ 38, 392 P.3d 398; *State v. Robbins*, 2009 UT 23, ¶ 19, 210 P.3d 288; *State v. Carrell*, 2018 UT App 21, ¶¶ 50, 53, 414 P.3d 1030. "[W]itness testimony is inherently improbable and may likewise be disregarded if it is (1) physically impossible or (2) apparently false." *Robbins*, 2009 UT 23, ¶ 16. "Testimony is physically impossible when what the witness claims happened could not have possibly occurred. On the other hand, testimony is apparently false if its falsity is apparent, without any resort to inferences or deductions." *State v. Cady*, 2018 UT App 8, ¶ 19, 414 P.3d 974 (quotation simplified).

¶21 First, J.A.M. claims it is inherently improbable that Victim did not consent to hugging and kissing on the third floor but

---

(…continued)
or another exception to preservation. But because "a defendant need not file a separate motion or make a separate objection to challenge the sufficiency of the evidence supporting the court's factual findings in a bench trial," *State v. Holland*, 2018 UT App 203, ¶ 9, 437 P.3d 501, we resolve J.A.M.'s argument on the merits, *see State v. Jok*, 2019 UT App 138, ¶ 20 n.8, 449 P.3d 610 (resolving an unpreserved inherent improbability challenge after a bench trial and declining to address "whether the inherent-improbability doctrine applies at all to bench trial verdicts, where the trial court has presumably not only determined that sufficient evidence existed but that this evidence met the burden of proof beyond a reasonable doubt"), *cert. granted*, 456 P.3d 386 (Utah 2019); *cf. Doyle*, 2018 UT App 239, ¶¶ 17–19 (declining to reach an unpreserved inherent improbability argument after a jury trial).

"willingly walked with [J.A.M.] to an isolated, dark area of the school on the first floor." We take the opportunity to note that not all victims of sexual assault or nonconsensual sexual conduct react in the same manner, *see Nunes*, 2020 UT App 71, ¶¶ 32–33 (noting victims of sexual assault display a "diverse range of reactions" and collecting cases), and the fact that Victim testified that the activity on the third floor was nonconsensual but that she still walked downstairs with J.A.M. does not come close to rising to an inherent improbability. Because victims react in varying ways, *see id.*, we cannot characterize as patently false Victim's testimony on that point, and because Victim maintained throughout her testimony that the third floor kissing was nonconsensual, it was not internally inconsistent, *see Carrell*, 2018 UT App 21, ¶ 53 ("In order to meet the first element of the *Robbins* test, the witness's testimony at trial must be internally inconsistent; the fact that a witness's trial testimony is somewhat at odds with other evidence in the case . . . is not enough to render that testimony 'inherently improbable.'"). Therefore, assuming without deciding that the video does not constitute corroborating evidence that the hugging and kissing on the third floor was nonconsensual, J.A.M. has not carried his burden of showing Victim's testimony was inherently improbable. *See Skinner*, 2020 UT App 3, ¶ 31.

¶22   Second, J.A.M. alleges it was physically impossible that Victim saw his penis under his shirt as she exited the restroom and that he also "immediately grabbed her from behind" and waited outside the restroom only to attack her upon exiting. But this is not physically impossible, nor is this testimony internally inconsistent or patently false. *See id.*; *State v. Jok*, 2019 UT App 138, ¶ 23, 449 P.3d 610, *cert. granted*, 456 P.3d 386 (Utah 2019); *Carrell*, 2018 UT App 21, ¶¶ 50, 53. Instead, as the State argues, it is likely that, upon exiting the restroom, Victim immediately saw the "bump" of J.A.M.'s penis and then he "stepp[ed] around [her] to grab her from behind." This is a "reasonable explanation"; therefore, "[w]e do not read this testimony as

being possible only if [J.A.M. was in two places at once], and we do not consider this testimony to be demonstrably false." *See Jok*, 2019 UT App 138, ¶ 24 n.10.

¶23    Finally, J.A.M. claims it is inherently improbable that he would not have shown visible signs of arousal on the third floor only to be visibly aroused, approximately twenty minutes after he and Victim stopped kissing, and that he would have been unable to drag Victim into the restroom for ten minutes because there was nothing for her to grab onto to resist his efforts. But not only was Victim's testimony to both of these points internally consistent, J.A.M. has not demonstrated how it was patently false or physically impossible. *See id.* And as the State points out, that J.A.M.'s penis was immediately apparent to Victim on the first floor is instead "indicative of his intent to commit a sexual offense." We therefore reject J.A.M.'s claims that Victim's testimony was inherently improbable.

C.     The Juvenile Court's Factual Finding

¶24    J.A.M. claims the juvenile court clearly erred when it found his penis was "protruding" because Victim testified that she could see only a "bump" under his shirt and could not definitively say whether his penis was out of his pants. The court's factual findings are reviewed under the clearly erroneous standard, meaning "we will set aside [its] decision only when that decision is against the clear weight of the evidence, or if we otherwise reach a definite and firm conviction that a mistake has been made." *In re J.C.*, 2016 UT App 10, ¶ 13, 366 P.3d 867 (quotation simplified).

¶25    Victim testified that, upon exiting the restroom, she could see the "shape of" and "bump" of J.A.M.'s penis and that his genitals were "out" and hidden only under his shirt. Victim also testified that J.A.M.'s penis was noticeable on the first floor, but it was not noticeable when they were hugging and kissing on the third floor. And when J.A.M.'s counsel suggested "[m]aybe

[Victim] could see it through both [his shirt and pants]," Victim responded, "Yes," and counsel did not seek further clarification. In its factual findings, the juvenile court said J.A.M.'s "penis was obvious to . . . Victim where it had not been obvious before," and although the court did not "find beyond a reasonable doubt whether [J.A.M.'s] pants were unbuttoned or unzipped," "it was immediately obvious to. . . Victim that [his] penis was protruding and more visible than it was before."

¶26   We discern no clear error here. Although Victim never used the word "protruding" to describe J.A.M.'s penis, she did describe it as being "out," a visible "bump," and obvious where it had not been before. Thus, it does not follow that it was clearly erroneous for the court to conclude J.A.M.'s penis was "protruding" while also being "visible" and "obvious" based on Victim's testimony.

## II. Inference Regarding Intent

¶27   J.A.M. contends the juvenile court erred when it inferred he had intended to commit a sexual offense. His argument has two components. First, he claims "[t]he aggravated kidnapping statute requires an act in addition to the unlawful detention," and because no such act occurred, the court's inference was erroneous. Second, J.A.M. argues that, even if the statute does not require an additional act, the facts do not support the inference that he intended to commit a sexual offense.

### A.    Aggravated Kidnapping Statute

¶28   As relevant here, "[a]n actor commits aggravated kidnapping if the actor, in the course of committing unlawful detention . . . acts with intent . . . to commit a sexual offense as described in [the Utah Criminal Code]." Utah Code Ann. § 76-5-302(1)(b)(vi) (LexisNexis Supp. 2019). "To prove that an aggravated kidnapping occurred, the State must demonstrate that . . . an unlawful detention occurred, in conjunction with

aggravating circumstances." *State v. Wilder*, 2016 UT App 210, ¶ 18, 387 P.3d 512, *aff'd*, 2018 UT 17, 420 P.3d 1064.

¶29 J.A.M. contends the aggravated kidnapping statute requires an "act in addition to" the unlawful detention, and he points to a number of cases in which this court or our supreme court have affirmed aggravated kidnapping convictions where the defendant voiced an intent to rape the victim, *see State v. Garcia*, 2010 UT App 196, ¶ 11 n.1, 236 P.3d 853, demanded the victim remove her clothes and perform oral sex, *see Wilder*, 2016 UT App 210, ¶ 4, or otherwise physically assaulted or threatened the victim, *see State v. Jolivet*, 712 P.2d 843, 844 (Utah 1986); *State v. Kirby*, 2016 UT App 193, ¶¶ 3–9, 382 P.3d 644. J.A.M. claims that, because he "did not do or say anything threatening or sexual to" Victim, he "did not touch [her] anywhere but her waist and her feet," and "the only other 'act' was [Victim's] incredible claim that she could see the 'bump' of [J.A.M.'s] genitals out of his jeans but still under his shirt," the State did not establish "the 'act' element of the aggravated kidnapping statute."

¶30 But that misconstrues the law. As noted above, the statute requires an unlawful detention "in conjunction with aggravating circumstances." *Wilder*, 2016 UT App 210, ¶ 18. As J.A.M. concedes, an unlawful detention occurred. Therefore, the only question is whether the "aggravating circumstances" must consist of an additional act beyond the unlawful detention. They do not. The statute requires, in relevant part, that "in the course of committing unlawful detention," the defendant "acts with intent . . . to commit a sexual offense." Utah Code Ann. § 76-5-302(1)(b)(vi). Because the "act" referenced in the statute is preceded by "in the course of committing unlawful detention," *id.*, the plain language of the statute demonstrates that the act of committing an unlawful detention be performed with the intent to commit a sexual offense. Therefore, we reject J.A.M.'s claim that the aggravated kidnapping statute requires an act in addition to the unlawful detention.

B.      Facts Supporting Inference to Commit a Sexual Offense

¶31    J.A.M. contends, even if there is no additional act required to satisfy the aggravated kidnapping statute, it was clearly erroneous for the juvenile court to infer, based on the hugging and kissing on the third floor and the visible bump of his penis under his clothes, that J.A.M. intended to commit a sexual offense. "Intent is a state of mind, which is rarely susceptible of direct proof. In the absence of direct proof, intent can be inferred from conduct and attendant circumstances in the light of human behavior and experience. Such inferences are routinely employed in cases requiring proof of sexual intent." *In re D.M.*, 2013 UT App 220, ¶ 10, 310 P.3d 741 (quotation simplified).

> When intent is proven by circumstantial evidence, we must determine (1) whether the State presented any evidence that the defendant possessed the requisite intent, and (2) whether the inferences that can be drawn from that evidence have a basis in logic and reasonable human experience sufficient to prove that the defendant possessed the requisite intent.

*State v. Whitaker*, 2016 UT App 104, ¶ 13, 374 P.3d 56 (quotation simplified).

¶32    The juvenile court determined, based on its findings of fact, "that some kind of sexual act sufficient to meet the statutory requirements [of forcible sexual abuse] was about to occur." "Forcible sexual abuse contains two elements of intent: a general intent to take indecent liberties or touch the anus or genitals of another without that person's permission and the specific intent or purpose to cause substantial emotional or physical pain or to sexually arouse or gratify any person." *State v. Cegers*, 2019 UT App 54, ¶ 49, 440 P.3d 924 (quotation simplified).

¶33   The evidence supports the juvenile court's reasonable inference that J.A.M. intended to commit forcible sexual abuse. The court credited Victim's testimony that J.A.M.'s penis "shape" and "bump" were obvious to her when she exited the restroom, and the court inferred that this meant J.A.M. was sexually aroused, which in turn the court inferred to mean he intended to commit a sexual offense. The court also used the activity on the third floor—whether it was consensual or not—as a basis to conclude J.A.M. formed the requisite intent. To be sure, evidence that J.A.M. vocalized his intentions would have been helpful to infer intent to commit a sexual offense, *see Whitaker*, 2016 UT App 104, ¶ 14 (identifying cases in which circumstantial evidence of sexual intent "could reasonably be inferred with a basis in logic and human experience"), but doing so is not required to establish the inference.

¶34   Although we recognize this is a close case, because a "foundation for the court's decision exist[ed] in the evidence," we are not permitted to "engage in a reweighing of the evidence." *See In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435. Thus, "we cannot say that the juvenile court's inference that [J.A.M.] possessed a sexual intent is so flawed as to render the inference clearly erroneous," *see In re D.M.*, 2013 UT App 220, ¶ 11 (quotation simplified), and we affirm the juvenile court's conclusion that J.A.M. intended to commit a sexual offense when he unlawfully detained Victim.

CONCLUSION

¶35   There was sufficient evidence for the juvenile court to adjudicate J.A.M. delinquent of aggravated kidnapping. And the court did not err when it inferred that J.A.M. intended to commit a sexual offense.

¶36   Affirmed.

_____